439 Mich. 715 (1992)
486 N.W.2d 639
In re APPORTIONMENT OF THE STATE LEGISLATURE  1992
(NEFF v. SECRETARY OF STATE)
Docket No. 92092.
Supreme Court of Michigan.
Released June 15, 1992.
Order entered April 1, 1992.
See order entered April 1, 1992, ante, p 251.
MEMORANDUM OPINION.
On several prior occasions, this Court has found it necessary to communicate, sua sponte, our views concerning a public question of substantial importance to the whole body politic. In re 1976 PA 267, 400 Mich 660; 255 NW2d 635 (1977); In re Districting for Court of Appeals, 372 Mich 227; 125 NW2d 719 (1964); In re Head Notes to the Opinions of the Supreme Court, 43 Mich 641; 8 NW 552 (1881). A similar occasion has now arisen.
On April 1, 1992, we entered an order adopting, with modifications, the apportionment plan submitted by the special masters. Accordingly, this Court's order of April 1, 1992, remains the law of Michigan, cloaked with the presumption of constitutionality until an appeal is filed in the proper court, the United States Supreme Court, and that Court rules otherwise.
Thus, this memorandum opinion is entered to communicate the basis of our decision and, in the spirit of comity, to assist the federal court in the suit filed in the United States District Court for the Eastern District of Michigan.[1]
*716 I
A recurring part of the American political scene is the periodic apportionment and districting that follows each decennial census.[2] It is axiomatic that apportionment is of overwhelming importance to the political parties. In recent years, other segments of society have increasingly realized the importance of this undertaking.
Although apportionment is primarily a legislative task, this Court's involvement in the process is of long standing. The constitutions of 1835, 1850, and 1908 required that the Legislature be apportioned following each decennial federal census.[3] The purpose was to achieve a degree of fair representation, based on population.[4] Districts were to be contiguous, and of a reasonably compact shape.[5] Recognizing the importance of local communities, and the harm that would result from splitting the political influence of these communities, each of these constitutions explicitly protected jurisdictional lines.[6]
*717 In a number of early mandamus actions against the Secretary of State,[7] this Court was asked to rule that an apportionment was inequitable or otherwise violative of the constitutional provisions regarding the allocation of districts.[8] Where relief was granted, it was ordinarily in the form of an order compelling the Secretary of State to conduct the election under the preceding valid apportionment.[9]
The principle that apportionment should honor jurisdictional lines was taken one step further in the 1952 amendments of the 1908 constitution. The districts of a thirty-four-member Senate were frozen into designated counties.[10] The Legislature's decennial apportionment task was limited to the House.[11]
Under the 1908 constitution, as amended in 1952, few state constitutional issues remained. During the following years, however, an evolving appreciation of the constitutional aspects of apportionment helped develop the one-person/one-vote *718 movement. After apportionment issues were found to be justiciable,[12] this Court ruled in Scholle[13] that the 1952 amendments concerning Senate districts were invalid.
While Scholle was being litigated, the 1961 Constitutional Convention was in progress. The framers produced a constitution that called for a Senate that would be apportioned under a weighted formula involving both land area and population. Const 1963, arts 2-5. The 1963 constitution specifically directed that, in apportioning the Legislature, the highest allegiance was to be given to county lines. Wherever possible, city and township lines were also to be followed. Districts were to be compact, contiguous, and as nearly uniform in shape as possible.[14]
The 1963 constitution also established the Commission on Legislative Apportionment (CLA). This body had eight members, four from each of the leading political parties.[15] The 1963 constitution further provided that, if the CLA was unable to adopt a plan, the rival plans were to be submitted to this Court, which was then to "determine which plan complies most accurately with the constitutional requirements."
Not long after the adoption of the 1963 constitution, the United States Supreme Court issued its decision regarding the principles of one-person/one-vote.[16] In time, this led to a determination that *719 the weighted land/population formulation for apportioning the Michigan Legislature needed to be set aside.[17]
Notwithstanding that much of the language found in the 1963 apportionment sections was no longer to be enforced, the CLA process continued in 1972, with the eventual result that this Court apportioned the state.[18]
A decade later, this Court decided In re Apportionment of State Legislature  1982, 413 Mich 96; 321 NW2d 565 (1982).[19] Observing that the United States Supreme Court had overturned the 1963 constitution's requirements concerning the allocation of legislative districts,[20] this Court concluded that "[w]hen the weighted land area/population apportionment formulae fell, all the apportionment rules fell because they are inextricably related." 413 Mich 138.[21]
This Court recognized, however, that it retained *720 the "responsibility to provide for the continuity of government by assuring that the people will be provided the opportunity to elect a lawfully apportioned Legislature in the 1982 election." 413 Mich 116. To that end, we asked Bernard J. Apol, former Director of Elections for the Secretary of State, to produce maps in conformance with a set of directions drawn from the Michigan Constitution and other controlling authorities. A clarified set of directions, sent to Mr. Apol in response to his inquiry, was recounted in a later opinion written by Justice LEVIN and Justice FITZGERALD:
*721 1. The Senate consists of 38 districts.
2. The House consists of 110 districts.
3. All districts shall be contiguous, single-member districts.
4. The districts shall have a population not exceeding 108.2% and not less than 91.8% of the ideal district which, based on the 1980 census, would contain 243,739 persons in the Senate and 84,201 persons in the House.[[22]]
5. The boundaries of the districts shall first be drawn to contain only whole counties to the extent this can be done within the 16.4% range of divergence and to minimize within that range the number of county lines which are broken.
6. If a county line is broken, the fewest cities or townships necessary to reduce the divergence to within 16.4% shall be shifted; between two cities or townships, both of which will bring the district within the range, the city or township with the least population shall be shifted.
7. Between two plans with the same number of county line breaks, the one that shifts the fewest cities and townships statewide shall be selected; if more than one plan shifts the same number of cities and townships statewide, the plan that shifts the fewest people in the aggregate statewide to election districts that break county lines shall be selected.
8. In a county which has more than one senator or representative, the boundaries of the districts shall first be drawn to contain only whole cities and townships to the extent this can be done within the 16.4% range of divergence and to minimize within that range the number of city and township lines which are broken.
9. If a city or township line is broken, there shall be shifted the number of people necessary to achieve population equality between the two election districts affected by the shift, except that in lieu of absolute equality the lines may be drawn *722 along the closest street or comparable boundary; between alternative plans, shifting the necessary number of people, the plan which is more compact is to be selected.
10. Between two plans, both of which have the same number of city and township breaks within a particular county, the one which minimizes the population divergence in districts across the county is to be selected.
11. Within a city or township which is apportioned more than one senator or representative, election district lines shall be drawn to achieve the maximum compactness possible within a population range of 98%-102% of absolute equality between districts within that city or township.
12. Compactness shall be determined by circumscribing each district within a circle of minimum radius and measuring the area, not part of the Great Lakes and not part of another state, inside the circle but not inside the district. The plan to be selected is the plan with the least area within all the circles not within the district circumscribed by the circle. [Omitted are footnotes containing further clarification of this Court's directions to Mr. Apol. In re Apportionment  1982 (opinion of LEVIN and FITZGERALD, JJ.) 413 Mich 154-156.]
Following a hearing, this Court adopted the apportionment plan submitted by Mr. Apol.[23] We explained that the plan would remain in effect until the Legislature and the Governor enacted a new plan.[24]
The 1982 apportionment was challenged in the United States Supreme Court, but that Court dismissed the appeal for want of substantial federal question. Kleiner v Sanderson, 459 US 900; 103 S Ct 201; 74 L Ed 2d 161 (1982).
*723 Since 1982, the Legislature has made one significant attempt to apportion itself. However, that effort (1983 PA 256) was found to be unconstitutional because of the manner in which it was enacted.[25]
II
Following the 1990 census, the Legislature again failed to apportion itself. Apparently foreseeing deadlock,[26] the Legislature did not move past the preliminary stages of an attempt.
In 1991, a lawsuit was filed in the Iosco Circuit Court, in which the plaintiffs asked the circuit judge to find the 1982 apportionment no longer valid in light of changes in the population, to enjoin elections under the 1982 apportionment, and to undertake a new and proper apportionment of the Michigan Legislature. Governor John M. Engler thereafter asked this Court to authorize the circuit judge to certify questions that would aid in apportioning the Legislature.[27]
At about the same time, an original action was filed in this Court. Our jurisdiction was invoked under Const 1963, art 4, which had formed the *724 basis of our 1982 actions.[28] In light of the pendency of this new matter, we dismissed the Iosco Circuit Court case.[29]
Still giving the Legislature additional time in which to proceed, we entered a December 9, 1991, order[30] that appointed three special masters[31] and directed them to submit an apportionment plan if the Legislature and the Governor did not enact one by January 15, 1992.[32]
The masters considered plans that had been submitted by several sources, including the major political parties. In addition, they conducted several days of hearings. On February 20, 1992, they issued their report.
The masters determined that none of the plans submitted to them was satisfactory. They stated that these plans "either fail to comply with the 1982 criteria or do so only facially." Further, the plans exhibited "a disregard of some specific criteria, such as community of interest." The masters said that one of the political parties had presented a plan that included "districts whose configuration *725 would challenge both the candidates and the voters to understand where their district lies."
Thus the masters drew their own plan. In doing so, they followed the same criteria used by Mr. Apol in 1982, although they also gave significant attention to § 2 of the Voting Rights Act of 1965, as amended in 1982 (VRA), 42 USC 1973. The statute had not played a role in the 1982 apportionment. Explaining their method, the masters also said this:
The panel did not consider political partisanship in any way and its plan is "incumbent neutral," in that no attempt whatsoever was made to determine what effect the redrawn districts might have on existing officeholders. The panel concluded that these concepts, as well as "political fairness," which might quite properly be considered in legislatively drafted plans should not be considered by nonpartisan masters.
After observing that the political parties had stipulated that, as in 1982, 16.4 percentage points was the maximum allowable population divergence, the masters continued:
The one thing that became clear as this panel reviewed the submittals and set about its own task, was that there should be no absolute hierarchy of criteria. While counties may be the building blocks of our apportionment system (1982, 413 Mich 125), county lines were "broken" when necessary to achieve acceptable population divergence; flexibility in population divergence was employed to maintain minority electorial participation already realized; VRA interests were recognized and followed, but not to the exclusion of concerns of integrity of existing boundary lines, communities of interest, compactness and contiguity. [Emphasis supplied.]
*726 From these decisional principles, the masters produced an apportionment plan that was filed with this Court on February 20, 1992. Following submission of the masters' plan, we invited comment, and conducted a public hearing on March 4, 1992.[33]
*727 After full and careful consideration of the record and of the subsequent comments addressed to this Court, we adopted, with modification, the plan submitted by the masters.[34]In re Apportionment of State Legislature  1992 (Neff v Secretary of State), 439 Mich 251; 483 NW2d 52 (1992).
III
Among the comments we received regarding the report of the special masters, there are two areas that warrant extended discussion. Some persons felt that the masters' plan would have violated the VRA. We will address that question in section IV.
Concern was also expressed regarding the population divergence found in the masters' plan.[35] In 1982, we had directed that in apportioning the Legislature, the maximum permissible divergence *728 between the largest and smallest districts would be 16.4 percentage points.[36] The proposal developed by the masters approached, but did not exceed, that limit.[37] The masters' plan for the Senate had a maximum deviation of 15.81 percentage points (ranging from 7.76 percent under the average to 8.05 percent over), and the plan for the House had a range of 16.13 points (from 8.01 percent under the average to 8.12 percent over).[38]
The plaintiffs and the intervening defendants in this matter (whose interests aligned with the major political parties) stipulated before the masters to the use of the 16.4 percentage-point divergence *729 figure.[39] They noted in the stipulation that our 1982 decision was appealed to the United States Supreme Court on the basis of a challenge to that maximum deviation, but the Court dismissed for lack of a substantial federal question. Kleiner v Sanderson, supra. Such dismissal is a disposition on the merits and has precedential effect. Hicks v Miranda, 422 US 332; 95 S Ct 2281; 45 L Ed 2d 223 (1975).
As we have mentioned, several of the persons who commented on the masters' plan argued that the range was excessive and violated the Equal Protection Clause. The focus of their argument was Brown v Thomson, 462 US 835, 839; 103 S Ct 2690; 77 L Ed 2d 214 (1983). That case concerned the apportionment of the Wyoming House of Representatives and focused particularly on the allocation of one seat to the smallest county in the state. Because of the small population of that county, the plan had a total deviation from the average of 89 percentage points.[40] Those who criticized the masters' use of the 16.4 percentage-point limit focused on the following language in the United States Supreme Court's decision:
In view of these considerations, we have held that "minor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." [Gaffney v Cummings, 412 US 735, 745; 93 S Ct 2321; 37 L Ed *730 2d 298 (1973).] Our decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations. See, e.g., Connor v Finch, 431 US 407, 418 [97 S Ct 1828; 52 L Ed 2d 465] (1977); White v Regester, 412 US 755, 764 [93 S Ct 2332; 37 L Ed 2d 314] (1973). A plan with larger disparities in population, however, creates a prima facie case of discrimination and therefore must be justified by the State. See Swann v Adams, 385 US 440, 444 [87 S Ct 569; 17 L Ed 2d 501] (1967) ("De minimis deviations are unavoidable, but variations of 30% among senate districts and 40% among house districts can hardly be deemed de minimis and none of our cases suggests that differences of this magnitude will be approved without a satisfactory explanation grounded on acceptable state policy"). [462 US 842-843. Emphasis added.]
We were persuaded that those who criticized the masters' population range had read too much into the United States Supreme Court's statement in Brown. That decision did not create a 10 percentage-point limit. The Wyoming case before the Court had far larger divergences. The illustrative cases cited by the Court preceded our 1982 decision[41] and the United States Supreme Court's dismissal of the appeal of that decision. Rather, Brown merely said that larger divergences must be justified by valid state concerns.[42] In fact, Brown itself reaffirmed the validity of the very state *731 policies that Michigan has historically used in its apportionment of the Legislature:
We have recognized that some deviations from population equality may be necessary to permit the States to pursue other legitimate objectives such as "maintain[ing] the integrity of various political subdivisions" and "provid[ing] for compact districts of contiguous territory." [Reynolds v Sims, 377 US 533, 578; 84 S Ct 1362; 12 L Ed 2d 506 (1964).] As the Court stated in Gaffney, "[a]n unrealistic overemphasis on raw population figures, a mere nose count in the districts, may submerge these other considerations and itself furnish a ready tool for ignoring factors that in day-to-day operation are important to an acceptable representation and apportionment arrangement." 412 US 749.
* * *
There also can be no question that Wyoming's constitutional policy  followed since statehood  of using counties as representative districts and ensuring that each county has one representative is supported by substantial and legitimate state concerns. In Abate v Mundt, 403 US 182, 185 [91 S Ct 1904; 29 L Ed 2d 399] (1971), the Court held that "a desire to preserve the integrity of political subdivisions may justify an apportionment plan which departs from numerical equality." See Mahan v Howell [410 US 315, 329; 93 S Ct 979; 35 L Ed 2d 320 (1973)]. Indeed, the Court in Reynolds v Sims, supra, singled out preservation of political subdivisions as a clearly legitimate policy. See 377 US 580-581.
Moreover, it is undisputed that Wyoming has applied this factor in a manner "free from any taint of arbitrariness or discrimination." Roman v Sincock, 377 US 695, 710 [84 S Ct 1462; 12 L Ed 2d 620] (1964). The State's policy of preserving county boundaries is based on the State Constitution, has been followed for decades, and has been applied consistently throughout the State. [462 US 842-843.]
*732 As noted, the result in Brown was to let stand an apportionment plan with far larger deviations than that submitted by our panel of masters.[43]
No one can deny that it would have been possible to achieve lower levels of population divergence. Indeed, if one ignored all jurisdictional boundaries, one could probably produce districts that varied by only a fraction of a percentage point. However, there are compelling reasons not to proceed in such a manner. For well over a century, Michigan law has recognized that effective representative government is strongly enhanced by apportioning the state in a manner that honors jurisdictional lines.[44]
State legislators are to represent their constituents. A legislator can perform that function only if there is some real community of interest among the represented group  without that, the legislator *733 cannot speak effectively on the group's behalf. Neither can the group address its legislator in any useful manner. When a small portion of a jurisdiction is split from the remaining body and affixed to another governmental entity in order to reduce population divergence, the shifted area is likely to lose a great portion of its political influence. For that compelling reason, grounded in sound public policy, all four Michigan Constitutions have provided that jurisdictional lines, particularly county lines, are to be honored in the apportionment process.
We were thus convinced that the objective of preserving county and municipal boundaries, and the minimizing of shifts of municipalities and voters, justified the moderate disparity in district size present in the masters' plan.[45] Accordingly, we rejected the suggestion that the population variance in the masters' plan was excessive.
IV
As mentioned earlier, several of the persons who commented on the masters' plan expressed concern that it would violate § 2 of the Voting Rights Act of 1965, as amended in 1982 (VRA). 42 USC 1973. This statute is violated if "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens...." In analyzing whether such a violation has occurred, a court examines "the totality of circumstances" to determine whether members of the protected class "have less opportunity than *734 other members of the electorate to participate in the political process and to elect representatives of their choice."[46]
Those who challenged the masters' plan as a violation of the VRA observed that the proposed apportionment would have included five Senate and thirteen House districts in which a majority of persons would have been non-Hispanic blacks.[47] *735 Two types of argument were presented to challenge this aspect of the apportionment plan. One was the assertion that more districts could have been formed in which a racial minority comprised the majority of persons in the district (a so-called minority-majority district). Challengers also complained that several of the masters' minority-majority districts were "packed," i.e., they contained excessive concentrations of minority persons.
A
In determining whether the statute was violated, we followed the guidance of the United States Supreme Court, which had stated in Thornburg v Gingles, 478 US 30, 43-46; 106 S Ct 2752; 92 L Ed 2d 25 (1986), that one must examine the "totality of circumstances."[48] The Court also provided a list of factors that should be considered as *736 one reviews the totality of the circumstances.[49] The parties failed to demonstrate significant violations of these factors, most of which concern the extent to which racial discrimination has impeded the political participation of minority persons in Michigan.
*737 The parties did not establish that Michigan has ever been a jurisdiction with de jure segregation.[50] African-American persons[51] have been elected to statewide office in the executive and judicial branches, and to the state's educational governing boards. Numerous black persons have served in the Legislature, and many hold office at the local level. The parties have shown no history of keeping black persons away from the polls through devices such as discriminatory poll taxes or literacy tests. Nor have they shown that Michigan has used unusually large election districts, majority vote requirements, or anti-single-shot provisions,[52] or other practices that prevent black persons from achieving effective political representation.
One may contrast the great bulk of reported VRA decisions, which concern discriminatory patterns that the parties failed to show have ever been a problem in Michigan. For instance, the United States Supreme Court's 1991 Chisom decision[53] involved a Louisiana districting scheme that had impeded election of a black Supreme Court justice. Similarly, the United States Supreme Court's 1991 *738 affirmance in Jeffers[54] came in a case where a federal district court discussed an amazingly resilient pattern of discriminatory racial practices. Problems with multimember southern electoral districts (which are treated in Gingles and Chisom, and mentioned in Jeffers) arise in a great number of reported VRA cases.
B
As mentioned earlier, the specific VRA objections lodged against the masters' plan were twofold. The first was a claim that the VRA requires an effort to maximize the number of "viable" minority-majority districts, i.e., districts in which the minority population is sufficient to assure that minority persons are able to elect candidates of their choice.[55] The other was that the masters had drawn districts into which an excessive number of black persons were concentrated.
The arguments in favor of those objections were based upon the view that the VRA, originally enacted to shield southern blacks against Jim Crow abuses, was transformed in 1982[56] into a sword to be wielded by those seeking to assure proportional representation of minorities. It is thought by some *739 that, in order to give black persons a reasonable opportunity to elect candidates of their choice, it is necessary that approximately 65 percent of a district be comprised of black persons.
In Ketchum,[57] the United States Court of Appeals for the Seventh Circuit supplied an explanation of the 65-percent figure that is often used to assure that a district is drawn in compliance with the VRA.[58] Where the political power of a minority is reduced by artificially drawing districts with less than 60- or 65-percent minority population, claims of dilution ("fracturing") arise.[59]
*740 C
In considering whether such violations were present in the masters' plan, we looked to decisions in several other jurisdictions. Ketchum is such a case, for it illustrates a concept called "retrogression," in which an apportionment plan reduces the political clout of a minority group. The most recent census showed that the black and Hispanic populations of Chicago had increased significantly, relative to the white population, yet Chicago's fifty aldermanic districts were somehow apportioned to decrease the number of districts that could reasonably be expected to elect minority aldermen. The Seventh Circuit affirmed the finding of a VRA violation, and ordered additional proceedings concerning the remedy.[60]
Another significant decision arose from a dispute concerning Hispanic representation on the Los Angeles County Board of Supervisors. In Garza,[61] the Ninth Circuit offered a statement that appears at first reading to support those who believe that the VRA requires gerrymandering to achieve the maximum possible number of minority-majority districts. The court said that "[t]he deliberate construction of minority controlled voting districts is exactly what the Voting Rights Act authorizes."
However, that strong statement must be understood in its context. In violation of both the Fourteenth Amendment and the VRA, the electoral districts for the Los Angeles County Board of Supervisors had been gerrymandered, with discriminatory intent, to preclude Hispanic representation *741 on the Board. The statement quoted at the conclusion of the preceding paragraph of this opinion came in the remedy portion of the Garza opinion. To paraphrase, the deliberate construction of minority-controlled voting districts is exactly what the Voting Rights Act authorizes as a remedy when a violation has been proven. However, absent any other VRA violation, it is not a statutory violation to fail to gerrymander a map to maximize the number of minority-majority districts.[62]
We were aware that the California Supreme Court had affirmed, with slight modification and over a strongly worded dissent, an apportionment plan devised by masters who "`endeavored to draw boundaries that will withstand [§ 2 VRA] challenges under any foreseeable combination of factual circumstances and legal rulings.'"[63] There was much in the California decision with which we agreed,[64] but we did not believe it necessary to ignore Michigan's other lawful apportionment criteria in an effort to maximize the number of minority-majority *742 districts.[65] While some might find advantage in assuming that persons of one ethnic or racial background can be represented effectively only by permanently reserving a fixed number of districts for legislators of each race, we credited the citizens of Michigan with higher aspirations.[66]
D
It was also suggested that the masters' plan had "packed" too many black persons into some of the *743 districts in Wayne County.[67] Again, we sought guidance from decisions in other jurisdictions.
In Rybicki I,[68] the federal district court in Illinois considered a claim that a legislative apportionment plan discriminated against black voters by diluting their voting strength and providing white voters a disproportionate opportunity to elect candidates of their choice. The court found some purposeful dilution of black voting strength, and some instances of retrogression and intentional discrimination. However, the court rejected a claim of purposeful discrimination based on the "packing" of black votes on Chicago's South Side and the creation of a "wall" separating black and white residential areas.
While posttrial motions were pending in the case, Congress amended the VRA, eliminating the need to prove an intentional act. The district court thus reconsidered the case under the "effect" or "results" test and issued Rybicki II.[69] The court found that additional relief was necessary to eradicate vote dilution in certain districts in which "packing" had been proven at trial. However, in so doing, the court emphasized that the "wasting" of minority votes (many districts were more than 80 percent black and several were more than 90 percent black) did not itself constitute a violation of the VRA, under the totality of the circumstances. Indeed, the court noted that one "interior" district in the city had such a heavy concentration of *744 blacks that it "seems doubtful that, absent the most outlandish gerrymandering," it ever could be "deconcentrated." Id. at 1152, n 6.
Rather, the court undertook a "tracing" analysis to see whether certain district lines had been drawn to correspond with lines of racial division. It found several instances where "lines of highly concentrated black districts correspond to pronounced divisions between black and white populations," and others where "district lines, though not corresponding to such marked racial divisions, nevertheless correspond to significant divisions between blacks and whites and therefore are at least suspect."[70]Id. at 1157.
Examining the parties' claim of packing, we observed that the masters had succeeded in spreading the black population of Wayne County to a greater extent than was the case under the 1982 apportionment. In the Senate, three of the districts drawn in 1982 had very high concentrations (93.14 percent, 79.56 percent, and 77.64 percent) of black persons, whereas the masters proposed districts that, at the highest concentrations, were significantly more diverse (84.81 percent, 70.74 percent, and 70.23 percent black).[71] In the House, five districts drawn in 1982 had over 90 percent black persons. The masters reduced that number to three. They also reduced the number of arguably packed (over 80 percent black) districts from nine to seven.[72]
*745 As in the Chicago apportionment discussed in the Rybicki decisions, it was certain that portions of the City of Detroit are home to large concentrations of black persons. Obviously, districts can reflect that fact without being the product of gerrymandering. Such districts are not automatic violations of the VRA, nor should they be viewed as unfair if they accurately reflect the racial composition of persons residing in a particular area.
In Rybicki II, the court discussed "tracing," in which district lines are compared to known residential patterns, to determine whether maps have been drawn to reinforce racial barriers. A check of the plan proposed by the masters revealed no such problem. It was true that the Detroit city limits and the Wayne-Oakland County line were also district lines. However, these are neutral lines that the masters followed in accordance with sound public policy reflected in state constitutional provisions for over 150 years and in accordance with specific directives from this Court that were unsuccessfully challenged in the United States Supreme Court in 1982.
E
During the course of the public hearing, and in the written submissions that were received in the days surrounding the hearing, we were told by several persons that the masters' plan could be improved. Suggestions were offered concerning *746 ways in which lines could be redrawn.[73]
Respectful of the persons who offered these comments, and thankful for their efforts to assist the process, we nevertheless declined to make significant changes in the masters' plan because the masters' plan comported with the constitutional and statutory requirements of fair representation.
Had there been a violation of the VRA, this Court would have insisted on an apportionment plan that vigorously remedied the denial of voting rights. However, the VRA has not previously been violated in the course of legislative apportionment in Michigan and, in light of the totality of the circumstances, it was not violated under the masters' plan.[74] Absent a violation, there was no need to redraw Michigan's legislative districts in order to effect a VRA remedy.
*747 We were satisfied that the legislative districts drawn in 1982 reflected the distribution of Michigan citizens at that time, and that the districts proposed by the masters likewise reflected the distribution of Michigan citizens in 1992. Moreover, with modification of five of the House districts proposed by the masters, we were able to provide an even better racial balance in those southeast Michigan districts.[75]
We were persuaded that there was no showing that "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens" or that members of a protected class "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[76] The Court therefore determined that the *748 masters' plan as modified by this Court complied with the requirements of the VRA.
In sum, for the reasons given in our April 1, 1992, order,[77] as further explained in this memorandum opinion, we adopted with modification the apportionment plan submitted by the masters.
CAVANAGH, C.J., and LEVIN, BRICKLEY, BOYLE, RILEY, GRIFFIN, and MALLETT, JJ., concurred.
NOTES
[1] To this point, there has been no affirmative defense by the defendant in the federal case of the state's apportionment plan. The Attorney General has not, as yet, raised questions of jurisdiction, abstention, or res judicata. See, e.g., Illinois Legislative Redistricting Commission v LaPaille, 786 F Supp 704, 709-710 (ND Ill, 1992), and Members of the California Democratic Delegation v Eu, ___ F Supp ___ (ND Cal, March 3, 1992).
[2] The terms "apportionment" and "districting" are sometimes given slightly different meanings (apportionment referring to the allocation of legislators to an area, and districting referring to the alteration of district lines). For the sake of simplicity, and in keeping with established usage in Michigan, we will simply use the word "apportionment."
[3] See, generally, Const 1835, art 4, §§ 2-6; Const 1850, art 4, §§ 2-4; Const 1908, art 5, §§ 2-4.
[4] For instance, Const 1850, art 4, § 3 and Const 1908, art 5, § 3 required that, to the extent it could be done without violating the other rules governing apportionment, the House of Representatives was to be apportioned so that the population was divided as evenly as possible.
[5] The 1908 constitution spoke of representative districts that consisted of "convenient and contiguous territory." Const 1908, art 5, § 3.
[6] For instance, the 1835 constitution said that no county line could be broken in apportioning the Senate. Const 1835, art 4, § 6. The 1850 constitution repeated that rule, and added that no city or township could be divided in forming a representative's district. Const 1850, art 4, §§ 2, 3. As originally enacted, the 1908 constitution continued those rules, though it permitted municipalities to be broken where they crossed county lines. Const 1908, art 5, §§ 2, 3.
[7] Houghton Co Bd of Supervisors v Secretary of State, 92 Mich 638; 52 NW 951 (1892), Giddings v Secretary of State, 93 Mich 1; 52 NW 944 (1892), Williams v Secretary of State, 145 Mich 447; 108 NW 749 (1906), Stevens v Secretary of State, 181 Mich 199; 148 NW 97 (1914), and Stenson v Secretary of State, 308 Mich 48; 13 NW2d 202 (1944).
[8] From the constitutional language regarding the method of apportionment, and by implication from the provision requiring that census data be employed, this Court enforced an inexact requirement of fairness in numerical representation.
[9] Usually, this Court also stated that the Legislature still had an opportunity to apportion correctly.
[10] Const 1908, art 5, § 2, as amended.
[11] Counties with more than one senator were to be apportioned by the county board of supervisors. Another provision of the 1952 amendments said that the Board of State Canvassers was to apportion the House of Representatives each decade, if the Legislature failed to handle the task. Const 1908, art 5, § 4, as amended.
[12] See Baker v Carr, 369 US 186; 82 S Ct 691; 7 L Ed 2d 663 (1962).
[13] See Scholle v Secretary of State, 360 Mich 1; 104 NW2d 63 (1960), vacated and remanded sub nom Scholle v Hare, 369 US 429; 82 S Ct 910; 8 L Ed 2d 1 (1962), reh den 370 US 906; 82 S Ct 1247; 8 L Ed 2d 402 (1962), Scholle v Secretary of State (On Remand), 367 Mich 176; 116 NW2d 350 (1962), cert den sub nom Beadle v Scholle, 377 US 990; 84 S Ct 1901; 12 L Ed 2d 1043 (1964).
[14] House districts were to be as nearly square as possible.
[15] Const 1963, art 4, § 6.
[16] Reynolds v Sims, 377 US 533; 84 S Ct 1362; 12 L Ed 2d 506 (1964).
[17] Regarding apportionment during this time period, see In re Apportionment of State Legislature  1964, 372 Mich 418; 126 NW2d 731 (1964); In re Apportionment of State Legislature  1964, 372 Mich 461; 127 NW2d 862 (1964); In re Apportionment of State Legislature  1964, 373 Mich 247; 128 NW2d 721 (1964); In re Apportionment of State Legislature  1964, 373 Mich 250; 128 NW2d 722 (1964); In re Apportionment of State Legislature  1965, 376 Mich 410; 137 NW2d 495 (1965); In re Apportionment of State Legislature  1965-1966, 377 Mich 396; 140 NW2d 436 (1965), app dis sub nom Badgley v Hare, 385 US 114 (1966), reh den 385 US 1021 (1967).
[18] In re Apportionment of State Legislature  1972, 387 Mich 442; 197 NW2d 249 (1972).
[19] Reh den 413 Mich 149; 321 NW2d 585 (1982), app dis sub nom Kleiner v Sanderson, 459 US 900; 103 S Ct 201; 74 L Ed 2d 161 (1982).
[20] Marshall v Hare, 378 US 561; 84 S Ct 1912; 12 L Ed 2d 1036 (1964).
[21] As this Court explained in the 1982 case, 413 Mich 140-142:

Apart from population and land area, we see in the constitutional history of this state dominant commitments to contiguous, single-member districts drawn along the boundary lines of local units of government which, within those limitations, are as compact as feasible.
We accordingly direct that election districts shall be drawn in accordance with the following criteria:
(a) Senate and House election district lines shall preserve county lines with the least cost to the federal principle of equality of population between election districts consistent with the maximum preservation of county lines and without exceeding the range of allowable divergence under the federal constitution which, until the United States Supreme Court declares otherwise, shall be deemed to be 16.4% (91.8%-108.2%).
Where it is necessary to break county lines, because otherwise the range of allowable divergence would be exceeded, there shall be shifted the fewest cities or townships necessary to reduce the population divergence sufficiently to bring it within the range of allowable divergence.
Because of the narrowness of the range of allowable divergence, we anticipate that only one plan will organize the counties with the least breaking of county lines.
(b) After the county lines are drawn, the election district lines within those counties to which there is apportioned more than one senator or representative shall be drawn on city and township lines with the least cost to the federal principle of equality of population between election districts consistent with the maximum preservation of city and township lines and without exceeding the range of allowable divergence.
Where it is necessary to break city or township lines, because otherwise the range of allowable divergence would be exceeded, there shall be shifted the number of people necessary to achieve population equality between the two election districts affected by the shift.
(c) Within a city or township to which there is apportioned more than one senator or representative, election district lines shall be drawn to achieve the maximum compactness possible within a population range of 98%-102% of absolute equality between districts within that city or township. [Footnotes omitted.]
[22] Using 1990 census data, these figures would be 244,613 persons in the Senate and 84,503 persons in the House.
[23] Slight modifications were made by this Court prior to adoption.
[24] This Court also invited the Legislature and the Governor to substitute their own plan for the 1982 election, provided it was enacted into law by May 4, 1982. Such an enactment did not occur.
[25] Anderson v Oakland Co Clerk, 419 Mich 142; 350 NW2d 232 (1984); Anderson v Oakland Co Clerk, 419 Mich 313; 353 NW2d 448 (1984). The problem was that, in enacting 1983 PA 256, the Legislature violated Const 1963, art 4, § 24, which provides that "[n]o bill shall be altered or amended on its passage through either house so as to change its original purpose as determined by its total content and not alone by its title."
[26] The Governor of Michigan and a majority of the state senators belong to one political party, while a majority of the representatives belong to the other major party.
[27] In advance of the decennial census results, we had received a request in early 1990 from several legislators who asked us to reopen the 1982 case, and to apportion the state. We declined. In re Apportionment of State Legislature, 437 Mich 1208; 463 NW2d 713 (1990).
[28] In the 1982 decision, we clearly explained that "[t]he weighted land area/population formulae," "the remaining apportionment rules of art 4, §§ 2-6," "the function of the commission [CLA]," and "the commission itself" were "inextricably interdependent" and therefore "not severable." However, this Court did not invalidate Const 1963, art 4, § 6 insofar as it authorized this Court to fulfill its "responsibility to provide for the continuity of government by assuring that the people will be provided the opportunity to elect a lawfully apportioned Legislature in the 1982 election." 413 Mich 116.
[29] In re Executive Message of the Governor, unpublished order of the Supreme Court entered December 9, 1991 (Docket No. 92124); In re Apportionment of State Legislature  1992 (Neff v Secretary of State), 439 Mich 1203 (1991).
[30] Id.
[31] The presiding judge was Judge HAROLD HOOD of the Court of Appeals. The other two panel members were retired Judge T. JOHN LESINSKI of the Court of Appeals and retired Judge William R. Peterson of the 28th Judicial Circuit. By order of January 23, 1992, Judge William A. Porter of the 46th Judicial Circuit was substituted for Judge Peterson.
[32] January 15 passed with no legislative enactment.
[33] In re Apportionment of the State Legislature  1992, order of the Supreme Court entered February 20, 1992 (Docket No. 92092):

On order of the Court, a hearing will be held in the Supreme Court courtroom on March 4, 1992 at 2:00 P.M. regarding the legislative reapportionment plan submitted by the Special Panel of Masters. The parties to this action may file briefs not later than March 2, 1992 and may request oral argument.
In addition, any interested persons or organizations, including those who appeared as parties amicus curiae before the Special Panel, who wish to present objections to the adoption of the aforesaid reapportionment plan shall submit a written statement outlining the proponent's position in this regard to the Supreme Court Clerk no later than March 2, 1992.
Participation in the hearing will be limited to those timely filing such statements of position. The time to be permitted to each person who wishes to address the Court will be announced by the Clerk prior to the beginning of the hearing.
Those who presented views at the hearing or otherwise submitted comments on the masters' plan included:
ACLU Fund of Michigan, For Women Members of the Michigan Legislature; Alcona County Board of Commissioners; Latinos for Fair Representation; Charlevoix County Board of Commissioners; Michigan Legislative Black Caucus; Montmorency County Board of Commissioners; NAACP; Senate Democratic Caucus; Robert Block, City Administrator, City of Southfield; Raymond A. Charron, Judge, 26th District Court; Floyd Clack, State Representative 80th District; Harry Gast, State Senator 22nd District; Tom Hickner, State Representative 101st District; Glen Hop, Chair, 9th District Republican Committee; Thomas W. Jones, Detroit; John F. Kelly, State Senator 1st District; Thomas E. Klunzinger, Haslett, Ingham County; Carl J. Marlinga, Macomb County Prosecutor; Jim McBryde, State Representative 99th District; John McEwan, Former Mayor, City of River Rouge; James McNutt, State Representative 102nd District; Arthur Miller, State Senate Minority Leader, 27th District; Winifred Motherwell, Haslett, Ingham County; Richard Posthumus, Senate Majority Leader, 31st District; Thomas G. Power, State Representative 104th District; Norman S. Primus, South Bend, Indiana; Gary L. Randall, State Representative 89th District; Linda and Christopher Richardson, Livonia; David Robertson, State Representative 83rd District; Nelson W. Saunders, State Representative 7th District; Harold Schuitmaker, Chair, 4th District Republican Committee; John Strand, State Representative 84th District; Lynn Tate, President, River Rouge School Board; William Van Regenmorter, State Senator 23rd District; Donald VanSingel, State Representative 19th District; Ted Wallace, State Representative 10th District; Virginia L. White, Meridian Township Clerk, Ingham County; Thomas F. Wieder, Ann Arbor; Coleman A. Young, Mayor, City of Detroit.
[34] We note that in Members of the California Democratic Delegation v Eu, supra, a three-judge federal panel dismissed a VRA challenge to the California congressional apportionment, deferring to the decision of the California Supreme Court in Wilson v Eu, 1 Cal 4th 707; 4 Cal Rptr 2d 379; 823 P2d 545 (1992). The panel stated:

Absent the conferring of exclusive jurisdiction on the federal courts, and absent allegations that the state court's proceedings were in bad faith or unconstitutional, we must abstain and presume that the state courts will safeguard federal constitutional and voting rights.
Where abstention is required, and the state court proceeding has been concluded, the remedy is dismissal. [___ F Supp ___. Citations omitted. Slip op, p 15.]
[35] Total population divergence is the sum of the number of percentage points that separate the smallest district from an "ideal" (average) district and the number of percentage points that separate the largest district from the ideal. See New York City Bd of Estimate v Morris, 489 US 688, 700; 109 S Ct 1433; 103 L Ed 2d 717 (1989).
[36] The source of the 16.4 percentage-point figure was the United States Supreme Court's decision in Mahan v Howell, 410 US 315; 93 S Ct 979; 35 L Ed 2d 320 (1973). There, the Court permitted a Virginia apportionment which included a 16.4 percentage-point variation. The Court said that that range "may well approach tolerable limits." 410 US 329.
[37] Our order to the masters left open the matter of the allowable population divergence. We said:

4. Except as otherwise required by constitution or by law, the criteria to be employed in adopting a plan are those set forth in In re Apportionment of State Legislature  1982, 413 Mich 96, 141-142 (1982). However, we intimate no opinion with respect to the range of allowable population divergence (see Mahan v Howell, 410 US 315 [1973], and Brown v Thomson, 462 US 835; 103 S Ct 2690; 77 L Ed 2d 214 [1983]), or with respect to the application of the Voting Rights Act (see Thornburg v Gingles, 478 US 30 [106 S Ct 2752; 92 L Ed 2d 25 (1986)]). [439 Mich 1203 (1991).]
[38] The masters provided a statistical analysis of the plan, which in part showed the following:

 Senate House
 Average population over ideal 9,843.21 3,851.08
 Average population under ideal 9,843.05 3,453.28
 Population of districts with 4,706,065 4,532,080
 least population needed to (50.63%) (48.76%)
 elect a majority
 Number of districts within 3% of ideal 18 35
 Number of districts within 4% of ideal 20 57
 Number of districts within 5% of ideal 24 63
 Number of districts within 6% of ideal 26 81
 Number of county breaks 1 12
 Ratio of largest district to smallest 1.17 to 1 1.18 to 1

[39] The masters entered an order on January 17, 1992, which stated that "a plan with a range of divergency in excess of 16.4 percent (91.8 percent to 108.2 percent) cannot be justified and will not be considered." The plans submitted by the political parties complied with the panel's order, but contained divergence ranges of about that magnitude.
[40] The Wyoming plan had an average deviation of 16 percentage points. 462 US 839.
[41] Indeed, in our 1982 decision, we noted the emergence of 10 percentage points as a de minimis divergence. 413 Mich 128, n 17.
[42] The United States Supreme Court also acknowledged that the constitutionality of a state legislative apportionment plan is not to be judged by the more stringent population-divergence standard that governs congressional apportionment. See Mahan, supra. Where election district lines are drawn along county and city boundary lines, the apportioning body may, within limits, depart from the goal of population equality in order to satisfy other rational, legitimate state goals such as preserving the integrity of political subdivisions. Id.; see also Reynolds v Sims, supra.
[43] The average divergence in the masters' plan was 4.024 percentage points in the Senate, and 4.309 points in the House. That was a significant improvement over the average deviations in the 1982 apportionment, which were 5.306 percentage points in the Senate and 5.07 points in the House. 413 Mich 207-208. It could be argued that the Wyoming plan, with its 16 percentage-point average variation presented too great an overall level of variation. The majority and concurring justices did not reach that question because of the limited nature of the challenge to the Wyoming plan.
[44] Counties are the basic organizational unit of Michigan government. For example, the officials responsible for basic law enforcement and public recordkeeping  the prosecuting attorney, sheriff, clerk and register of deeds  are selected on a county basis. Const 1963, art 7, § 4. And many vital government services, which are an important part of the work of the Legislature, are provided at the county level. Similarly, the judicial circuits, Michigan's courts of general jurisdiction, are drawn on county lines. Const 1963, art 6, § 11. Likewise, districts for the Michigan Court of Appeals are drawn on county lines. Const 1963, art 6, § 8.

We previously have emphasized that this respect for jurisdictional boundaries extends to political entities within counties, as well as to the counties, themselves, and that it has historical underpinnings. Apportionment of Wayne Co Bd of Comm'rs  1982, 413 Mich 224; 321 NW2d 615 (1982). There, we held that election districts for county commissioners must be drawn so as to preserve city and township lines, to the extent that this is compatible with the federal principle of equality of population.
[45] Of the plans urged as alternatives to the masters' plan, only one had a significantly smaller population divergence. However, this alternative plan would have required us to break more county lines and thus to shift more people into districts dominated by voters from another county.
[46] No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in [42 USC 1973b(f)(2)], as provided in subsection (b)....
(b) A violation of subsection (a) ... is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population. [42 USC 1973.]
[47] Wayne County Population Divergence Black Population
 Senate District 1 230,664 -13,949 (5.70%) 126,448 (54.82%)
 Senate District 2 229,997 -14,616 (5.98%) 162,704 (70.74%)
 Senate District 3 227,783 -16,830 (6.88%) 159,973 (70.23%)
 Senate District 4 227,314 -17,299 (7.07%) 192,798 (84.82%)
 Senate District 5 226,121 -18,492 (7.56%) 158,043 (69.89%)
 House District 2 81,492 -3,011 (3.56%) 52,722 (64.70%)
 House District 3 82,454 -2,049 (2.42%) 72,918 (88.43%)
 House District 4 82,133 -2,370 (2.80%) 73,833 (89.89%)
 House District 5 80,058 -4,445 (5.26%) 52,365 (65.41%)
 House District 6 82,732 -1,771 (2.10%) 56,842 (68.71%)
 House District 7 82,977 -1,526 (1.81%) 68,790 (82.90%)
 House District 9 81,439 -3,064 (3.63%) 65,369 (80.27%)
 House District 10 80,748 -3,755 (4.44%) 74,513 (92.28%)
 House District 11 81,669 -2,834 (3.35%) 78,241 (95.80%)
 House District 12 80,522 -3,981 (4.71%) 73,498 (91.28%)
 House District 13 80,124 -4,379 (5.18%) 45,747 (57.10%)
 House District 14 82,260 -2,243 (2.65%) 55,146 (67.04%)
 Genesee County
 House District 48 83,304 -1,199 (1.42%) 57,718 (69.30%)

[48] In Gingles, where an apportionment of multimember districts was found to violate the VRA, the Court also provided several threshold requirements for finding a VRA violation. "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. Second, the minority group must be able to show that it is politically cohesive.... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it ... to defeat the minority's preferred candidate." 478 US 50-51. Reported VRA decisions reveal uncertainty regarding whether these threshold tests must be shown where there is a challenge to the apportionment of single-member districts.

Assuming the threshold requirements apply, it is clear that Michigan has geographically compact areas with ample black persons to constitute a majority of some districts. With regard to whether black persons in Michigan vote in a politically cohesive manner and whether white voters are also likely to vote as a bloc, we made no findings. Although proofs had been taken during the evidentiary hearing before the masters, we were not satisfied that it was then possible to make such generalizations regarding the voting practices of such large and diverse groups of Michigan voters.
[49] In Gingles, the Court presented these considerations:

"1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
"2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
"3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
"4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
"5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
"6. whether political campaigns have been characterized by overt or subtle racial appeals;
"7. the extent to which members of the minority group have been elected to public office in the jurisdiction.
"Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:
"[8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.
"[9.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." [478 US 36-37.]
This list was taken from the legislative history (S Rep No 417, 97th Cong [2nd Sess], pt I at 28-29, reprinted in US Code Cong & Admin News, pp 206-207 [1982]) which, in turn, came from the analytical framework of White v Regester, supra, as refined and developed in several federal decisions.
[50] Nor did the parties' proofs sufficiently demonstrate a community of interest between and among the voter populations of Oakland County and the voter populations of the City of Detroit and Wayne County.
[51] African-American persons are the principal minority group in Michigan, and therefore our discussion was, in the main, limited to VRA arguments concerning black persons. However, we were aware that Michigan also has a substantial Hispanic population, and many persons of other racial and ethnic backgrounds. In this regard, we observed that the masters' plan reflected, in part, their desire to preserve intact a concentration of Hispanic population in southwest Detroit.
[52] Several VRA cases refer to "single-shot" voting, which is also called "plunking." Where a person can vote for several candidates in a field, the single-shot voter selects only one, in order to avoid adding votes to those against whom the person's most preferred candidate is running.
[53] Chisom v Roemer, 501 US ___; 111 S Ct 2354; 115 L Ed 2d 348 (1991).
[54] Jeffers v Clinton, 730 F Supp 196 (ED Ark, 1989), aff'd 498 US 1019; 111 S Ct 662; 112 L Ed 2d 656 (1991).
[55] Despite the express language of the proviso at the end of 42 USC 1973(b), some would argue that the number of minority-majority districts should be proportional to the statewide minority population. That would not be an appropriate objective in Michigan, since much of the state's minority population lives in areas where it is not possible to form a minority-majority district.
[56] As the United States Supreme Court explained in Gingles, the 1982 amendment of the VRA was a congressional response to Mobile v Bolden, 446 US 55; 100 S Ct 1490; 64 L Ed 2d 47 (1980), in which a plurality of the Court agreed that a discriminatory intent was an element of a VRA violation. The 1982 amendment substituted an "effect" test for the "intent" requirement stated in Bolden.
[57] Ketchum v Byrne, 740 F2d 1398, 1415 (CA 7, 1984), cert den 471 US 1135 (1985).
[58] The figure had appeared in an earlier VRA decision, United Jewish Organizations of Williamsburgh, Inc v Carey, 430 US 144; 97 S Ct 996; 51 L Ed 2d 229 (1977). The court in Ketchum explained:

A guideline of 65% of total population has been adopted and maintained for years by the Department of Justice and by reapportionment experts and has been specifically approved by the Supreme Court in circumstances comparable to those before us as representing the proportion of minority population reasonably required to ensure minorities a fair opportunity to elect a candidate of their choice. This figure is derived by augmenting a simple majority with an additional 5% for young population, 5% for low voter registration and 5% for low voter turn-out, for a total increment of 15%. This leads to a total target figure of 65% of total population. Obviously if voting age population statistics are used, 5% would drop out of the formula, leaving something in the vicinity of 60% of voting age population as the target percentage. [740 F2d 1415.]
However, we observe that the 65-percent rule has been questioned in a number of recent opinions. See, e.g., Burton v Sheehen, ___ F Supp ___ (SD SC, May 1, 1992).
[59] One also encounters in some cases the concept of an "influence district." These may be found in areas where there are insufficient members of a minority group to form a minority-majority district, but enough that the minority group can have a significant voice in the district. See, generally, Gingles, 478 US 46, n 12, Chisom, 115 L Ed 2d 364, n 24, Armour v Ohio, 775 F Supp 1044 (ND Ohio, 1991), and Hastert v Illinois Bd of Elections, 777 F Supp 634 (ND Ill, 1991). We read Armour and Hastert to mean, quite simply, that apportionment must proceed fairly, with significant blocks of minority groups neither being assembled nor dispersed through gerrymandering.
[60] By contrast, the Alaska Supreme Court took the position that a VRA-based corrective measure was unnecessary where there was no "retrogression" of minority interests in the affected area. Kenai Peninsula Borough v Alaska, 743, P2d 1352 (Alas, 1987).
[61] Garza v Los Angeles Co, 918 F2d 763, 776 (CA 9, 1990), cert den 498 US 1028; 111 S Ct 681; 112 L Ed 2d 673 (1991).
[62] We note that the United States Supreme Court has recently noted probable jurisdiction in Voinovitch v Quilter, 504 US ___; 112 S Ct 2299; 119 L Ed 2d 223 (1992). Quilter is an unpublished January 31, 1992 decision of the United States District Court for the Northern District of Ohio (Docket No. 91CY-2219). In Quilter, the defendants included the Republican members of the apportionment board and the person who had drafted the apportionment plan. They contended that the VRA requires, wherever possible, the creation of minority-majority districts. However, the federal panel stated:

We conclude that the Voting Rights Act and federal precedent do not dictate such a per se requirement. While creation of such districts may be an appropriate remedy under certain circumstances, Defendants here failed to make the requisite findings which demonstrate a violation of the Voting Rights Act, thereby permitting such remedy. [Quilter, slip op, p 2.]
[63] Wilson v Eu, n 34 supra.
[64] For example, the California Supreme Court said that their masters acted "quite properly" in assembling a plan that was "incumbent neutral."
[65] As noted above, the masters in this matter said that "there should be no absolute hierarchy of criteria." They further explained that "[w]hile counties may be the building blocks of our apportionment system (1982, 413 Mich 125), county lines were `broken' when necessary to achieve acceptable population divergence; flexibility in population divergence was employed to maintain minority electorial participation already realized; VRA interests were recognized and followed, but not to the exclusion of concerns of integrity of existing boundary lines, communities of interest, compactness and contiguity." That is an appropriate interplay of the VRA and other concerns. If there were an "absolute hierarchy of criteria," one could not move to a second requirement until one had exhausted the mathematical possibilities of maximizing the first. And one might never reach a third or fourth criterion. In this regard, we noted that in Watkins v Mabus, 771 F Supp 789, 805 (SD Miss, 1991), the federal district court said that it was expressing no opinion regarding whether the VRA requires a state to maximize the number of minority-majority districts. Watkins was affirmed in part. 502 US ___; 112 S Ct 412; 116 L Ed 2d 433 (1991).
[66] In the second of his two dissenting opinions in Jeffers, 730 F Supp 226-284, Judge Eisele discussed the election of Virginia Governor Douglas Wilder, and suggested that black/white voting patterns may, in significant part, be a reflection of political trends rather than racial distrust. He also observed that if the number of minority-majority districts is maximized, then it necessarily follows that black influence is elsewhere minimized, which reduces the number of districts in which blacks, fully participating in an integrated process, can hold the balance of power. The experience in Michigan has been that black voters sometimes choose white candidates and that white voters sometimes choose black candidates. If whites and blacks cannot compete fairly in an integrated political process, the alternative is to relegate minority citizens to second-class status as wards of the political/electoral system. These dangers are well discussed by Judge Eisele, writing for the court in Turner v Arkansas, 784 F Supp 553, 559-563 (ED Ark, 1991), aff'd 504 US ___; 112 S Ct 2296; 119 L Ed 2d 220 (1992).
[67] "Packing" is another abusive form of gerrymandering, which can reduce artificially the political power of a minority. When districts are drawn with over 80 percent minority population, care must be given that minority political influence has not been "wasted" by placing in such a district persons who properly belong in a district with a lesser percentage of minority persons. Rybicki v State Bd of Elections (Rybicki II), 574 F Supp 1147, 1152 (ND Ill, 1983).
[68] Rybicki v State Bd of Elections (Rybicki I), 574 F Supp 1082 (ND Ill, 1982).
[69] Rybicki v State Bd of Elections (Rybicki II), n 67 supra.
[70] The court asked the redistricting commission to submit new district lines in several areas to accommodate the VRA. Subsequently, the parties reached agreement and the court approved. Rybicki v State Bd of Elections (Rybicki III), 574 F Supp 1161 (ND Ill, 1983).
[71] We calculated these figures by applying present (1990 census) demographic data both to the districts proposed by the masters and to the districts that were drawn in the 1982 apportionment.
[72] We further observed that all the minority-majority House districts proposed by the masters had populations that were below the size of the average ("ideal") district. This had also been true under the 1982 apportionment. Drawing districts in such a fashion bolsters the relative voting strength of persons living in those districts, and diminishes the perceived problem of "wasted" minority votes. It also reduces the effect of significant population decreases in the affected areas.
[73] For instance, some noted population disparities; others urged that voters with common interests could be more effectively grouped. Still others maintained that more regular boundaries could have been drawn. And a number of persons complained of the masters' disinterest in the location of incumbents' residences. These comments illustrated that apportionment is a legislative function. Such ideas could have been aired in a legislative debate regarding development of a plan. However, the masters followed our 1982 criteria, which ignored the political considerations with which the Legislature could have dealt effectively.

Additionally, some criticized the use of census tracts rather than vote tabulation districts. There were reasonable arguments on both sides of this question. Because the masters had produced a satisfactory plan, and the suggested change in method would have caused great delay, we declined to set aside the plans on this basis.
Finally, there were complaints that precincts had been split between districts, requiring that voters at the same polling place vote in different districts. This is an inevitable consequence of apportionment, particularly where different agencies apportion federal, state, and local legislative bodies. There is a statutory mechanism for adjusting precincts to deal with such situations. MCL 168.655; MSA 6.1655.
[74] Compare Illinois Legislative Redistricting Commission v LaPaille, supra, in which a three-judge federal panel discussed the Illinois Supreme Court's decision regarding apportionment of the Illinois legislature. People ex rel Burris v Ryan, 147 Ill 2d 270; 167 Ill Dec 903; 588 NE2d 1033 (1992). In LaPaille, the panel observed that it was unclear whether the Illinois Supreme Court had considered, or made any findings regarding, the VRA, the Fourteenth Amendment, or the Fifteenth Amendment.
[75] The table reproduced ante, 439 Mich 253, showed the effect of the modifications made in the five House districts:

 District Masters' plan Plan as adopted
 4 89.89% 85.73%
 5 65.41% 70.02%
 11 95.80% 79.71%
 13 57.10% 71.95%
 14 67.04% 68.17%

[76] The gravamen of one argument made before this Court was that an affected area of Detroit and neighboring Wayne County communities with the same external boundaries as it had in 1982 will lose three seats. The 1982 apportionment produced seventeen seats in the House of Representatives, of which ten are currently held by black legislators. The VRA claim was that the loss of three seats (due to loss of population and reduction of population divergence) will be three black seats. The argument that three black seats will be lost was entirely speculative, given the fact that it is undisputed that there are eleven minority-majority districts created by the Court's plan, and a twelfth seat, the 2nd House district which has a 64.07 percent black population. Indeed, if one looks to the population of the affected area, it is clear that the plan increases the likelihood of electing black legislators. Using the figure of eleven minority-majority seats out of 110 seats in the House of Representatives, 8.3 percent of the state's population (the black population in the affected area) has the capacity to elect ten percent of the representatives in the House. Using the figure of twelve minority-majority seats (including District 2 at 64.07 percent), that 8.3 percent will be capable of electing eleven percent of the House.
[77] In that order, we stated, inter alia:

Others have suggested that the masters' plan would violate the VRA, particularly with regard to the apportionment of Wayne County. This statute is violated if "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by [the VRA] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 USC 1973(b). Thornburg v Gingles, 478 US 30, 43-46; 106 S Ct 2752; 92 L Ed 2d 25 (1986), teaches that one makes this determination through an examination of the "totality of circumstances."
We are persuaded, however, that the masters did consider the totality of circumstances and that they were appropriately concerned with recognition of VRA interests. To that end, in adopting today's reapportionment plan, we have accepted for the most part the masters' plan while reconfiguring House Districts 4, 5, 11, 13 and 14 in order to provide a better racial balance throughout these districts. [439 Mich 252-253.]