**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, INC. (NAACP), et al., Plaintiffs,**

**Ernest Lofton, et al., Intervening Plaintiffs,**

**v.**

**Richard H. AUSTIN, Secretary of State of Michigan, Defendant,**

**Michigan Republican Party, et al., Intervening Defendants,**

**State of Michigan, et al., Intervening Defendants.**

**No. 92–CV–72696–DT.**

United States District Court, E.D. Michigan.

July 14, 1994.

562

Samuel L. Walters, Asst. Gen. Counsel, N.A.A.C.P. Sp. Control Fund, Baltimore, MD, Paul J. Denenfeld, ACLU Fund, Legal Director, Robert A. Sedler, Detroit, MI, for plaintiffs.

Stephen J. Markman, Detroit, MI, Deborah Anne Devine, Asst. Atty. Gen., State Affairs Div., Lansing, MI, for defendants.

Before MARTIN, Circuit Judge, and COHN and FRIEDMAN, District Judges.

## OPINION

PER CURIAM.

This is a challenge to the Michigan Supreme Court's 1992 legislative apportionment plan. The various plaintiffs maintain that the Court's plan dilutes African–American voting strength in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, by creating an insufficient number of majority-black state House and Senate districts. The plaintiffs also contend that the plan intentionally concentrates African–Americans into certain districts, in numbers beyond those required for an electorally effective majority, in violation of the Fourteenth and Fifteenth Amendments. With respect to the state House of Representatives and Senate, we find that African–Americans have achieved, and are likely to maintain, proportional representation as measured by their percentage of the voting-age population in Wayne and Oakland Counties, which contain the districts in dispute. We further find that Michigan, in the recent past, has not engaged in practices designed to impede registration and voting by African–Americans. Finally, in regard to both the state House and Senate, we find that the plaintiffs have not shown that Michigan's failure to create additional majority-black districts was motivated by a discriminatory purpose. Accordingly, we deny the plaintiffs' request for relief.

### I. The Development of the 1992 Michigan Legislative Reapportionment Plan

Following the 1990 census, the Michigan legislature, for the third consecutive decade, failed to pass a reapportionment plan. The Michigan Supreme Court previously had been obliged to assume responsibility for state apportionment in 1972 and 1982, and by the latter date had compiled a list of criteria drawn from the Michigan Constitution and other sources for the task.[1] In 1991, once

---

1. In 1982, the Michigan Supreme Court asked Bernard J. Apol, at that time the Director of Elections for the Michigan Secretary of State, to submit a set of reapportionment maps in accordance with the following constraints, which are often referred to as the "Apol" criteria:
 1. The Senate consists of 38 districts.
 2. The House consists of 110 districts.
 3. All districts shall be contiguous, single-member districts.
 4. The districts shall have a population not exceeding 108.2% and not less than 91.8% of the ideal district, [as determined by the decennial] census.

5. The boundaries of the districts shall first be drawn to contain only whole counties to the extent this can be done within the 16.4% range of divergence and to minimize within that range the number of county lines which are broken.
6. If a county line is broken, the fewest cities or townships necessary to reduce the divergence to within 16.4% shall be shifted; between two cities or townships, both of which will bring the district within the range, the city or township with the least population shall be shifted.

again, an action was filed in the Michigan Supreme Court requesting it to find the 1982 apportionment plan invalid in light of the population changes reflected in the 1990 census, enjoin elections under that plan, and properly reapportion the legislature. In response, the Court appointed three state judges as special masters on December 9, 1991, and directed them to submit a plan if the Governor of Michigan and the legislature did not enact one by January 15, 1992. After this deadline passed without legislative action, the masters considered proposed plans submitted by a number of sources, including both major political parties. The masters also conducted hearings over the course of several days. Inexplicably, the present plaintiffs were not allowed to intervene in the proceedings before either the masters or the Michigan Supreme Court, even after having requested permission to do so.

In their report, the masters found the proposed plans unsatisfactory because they did not substantially comply with the "Apol" criteria described in 1982 by the Michigan Supreme Court. *See* list of criteria *supra*, at n. 1. The masters thus drew their own plan in accordance with these criteria, stating that they had taken into consideration the requirements of Section 2 of the federal Voting Rights Act, as amended in 1982. According

to the masters, incumbency and "political fairness" were not factors in formulating the plan, and although Voting Rights Act interests were recognized, they were not followed to the exclusion of concerns regarding existing boundary lines, communities of interest, compactness, and contiguity. In its final form, the masters' plan provided for four Senate districts and eleven House districts with a 65% or greater black population, as well as two House districts with a 57% or greater black population. This number of majority-minority districts was sufficient to avoid "retrogression," *i.e.*, a reduction in the percentage of such districts, measured with respect to the black population, as compared with the 1982 plan.

After the masters submitted their plan, the Michigan Supreme Court invited comment, and conducted a public hearing on March 4, 1992. The NAACP expressed its views on the plan at the hearing and in writing. Following consideration of these and other comments, the Court substantially adopted the masters' plan, making changes in five House districts to provide "a better racial balance." *Neff v. Secretary of State (In re Apportionment of State Legislature–1992)*, 439 Mich. 251, 253, 483 N.W.2d 52, 53 (1992). These changes resulted in the creation of a twelfth House district with a black population of

---

7. Between two plans with the same number of county line breaks, the one that shifts the fewest cities and townships statewide shall be selected; if more than one plan shifts the same number of cities and townships statewide, the plan that shifts the fewest people in the aggregate statewide to election districts that break county lines shall be selected.

8. In a county which has more than one senator or representative, the boundaries of the districts shall first be drawn to contain only whole cities and townships to the extent this can be done within the 16.4% range of divergence and to minimize within that range the number of city and township lines which are broken.

9. If a city or township line is broken, there shall be shifted the number of people necessary to achieve population equality between the two election districts affected by the shift, except that in lieu of absolute equality the lines may be drawn along the closest street or comparable boundary; between alternative plans, shifting the necessary number of people, the plan which is more compact is to be selected.

10. Between two plans, both of which have the same number of city and township breaks

within a particular county, the one which minimizes the population divergence in districts across the county is to be selected.

11. Within a city or township which is apportioned more than one senator or representative, election district lines shall be drawn to achieve the maximum compactness possible within a population range of 98%–102% of absolute equality between districts within that city or township.

12. Compactness shall be determined by circumscribing each district within a circle of minimum radius and measuring the area, not part of the Great Lakes and not part of another state, inside the circle but not inside the district. The plan to be selected is the plan with the least area within all the circles not within the district circumscribed by the circle.

*In re Apportionment of State Legislature–1982*, 413 Mich. 149, 154–56, 321 N.W.2d 585, 585–87 (1982) (footnotes omitted). The 1982 apportionment plan, promulgated according to these criteria, ultimately was challenged in the United States Supreme Court. The Court, however, dismissed the appeal for want of a substantial federal question. *See Kleiner v. Sanderson*, 459 U.S. 900, 103 S.Ct. 201, 74 L.Ed.2d 161 (1982).

greater than 65%, a commonly-used benchmark employed to determine whether a district has an "electorally effective" black majority. *See Ketchum v. Byrne,* 740 F.2d 1398, 1415–16 (7th Cir.1984) (explaining selection of 65% as a standard for electoral effectiveness), *cert. denied,* 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985). None of the parties to the Michigan proceedings asked the United States Supreme Court to review this disposition.

On May 15, 1992, the NAACP and various individual plaintiffs filed the present action, alleging that the Michigan Supreme Court's reapportionment plan violated the Voting Rights Act and the Fourteenth and Fifteenth Amendments. A three-judge district court was convened, as required under 28 U.S.C. § 2284, to hear the case. The plaintiffs contend that the Michigan Supreme Court should have modified the masters' plan to provide for two additional majority-black House districts, for a total of fourteen, and one additional Senate district, for a total of five, in Wayne and Oakland Counties. The failure to create these additional districts where it was possible to do so, they allege, was the result of intentional discrimination. The plaintiffs further maintain that this discrimination ensured that African–Americans would have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice," in violation of the Voting Rights Act. 42 U.S.C. § 1973(b); *Thornburg v. Gingles,* 478 U.S. 30, 43–46, 106 S.Ct. 2752, 2762–64, 92 L.Ed.2d 25 (1986).

After the decision of the Michigan Supreme Court had become final, and following our comments at the initial hearing in the present case, the Michigan Supreme Court issued an opinion on June 15, 1992, clarifying the analysis it said it conducted in accepting the masters' plan as modified. *In re Apportionment of the State Legislature–1992,* 439 Mich. 715, 486 N.W.2d 639 (1992). First, the Court reaffirmed its adherence to traditional jurisdictional redistricting criteria, as well as the federal Voting Rights Act, in promulgating its reapportionment plan. *Id.* at 720–28, 730–34, 486 N.W.2d at 643–46, 648–49. The Court then addressed the "one person-one vote" principle embodied in the equal protection clause of the Fourteenth Amendment, finding that legitimate state concerns justify Michigan's requirement of a maximum 8.2% district population divergence from the ideal. *Id.* at 730–32, 486 N.W.2d at 648–49. In this regard, the Court pointed out that all of the majority-black House and Senate districts created in its plan contain less than the ideal population, compensating somewhat for the population loss which occurred in urban Detroit between 1980 and 1990.

With respect to alleged Voting Rights Act violations, the Court maintained that there is no obligation under the Act to create the maximum possible number of majority-minority districts. *Id.* at 741, 486 N.W.2d at 653. The Court observed that one of the factors taken into account by the masters, in drawing district lines, was a desire to maintain intact a substantial concentration of Hispanic population in southwestern Detroit. *Id.* at 737 n. 51, 486 N.W.2d at 652. Redrawing district lines with an eye only towards maximizing the number of majority-black districts, it noted, probably would have required that the Hispanic population be split into different districts. With respect to the "concentration" claim, the Court found that the masters had succeeded in diffusing the black population of Wayne County to a greater extent than under the 1982 apportionment, with regard to both House and Senate districts. *Id.* at 744, 486 N.W.2d at 655. In the Court's view, district lines, on the whole, were neutrally drawn under its "tracing" analysis, and did not serve to unduly concentrate the black population. Finally, the Court found that under the totality of the circumstances, and in particular due to the relative lack of official, racially discriminatory policies in Michigan, as well as Michigan's historical tradition of equality, there had been no violation of the Act. *Id.* at 736–38, 486 N.W.2d at 651–52; *see also Gingles,* 478 U.S. at 43–46, 106 S.Ct. at 2762–64 (Section 2 is violated if, under the totality of the circumstances, it is shown that members of a protected class are not allowed to participate equally in political processes leading to the nomination and election of representatives).

## II. Scope of Review

■ Before assessing the merits of the plaintiffs' arguments, we define the scope of our review. We view our duty, as a three-judge district court, to be relatively limited under the circumstances of this particular case. The constitutional requirements of one person-one vote clearly have been met under the Michigan plan. Given that fact, the plaintiffs are asking us to require that district lines be redrawn without the benefit of a clearly-defined standard, articulated either by Congress or by the United States Supreme Court, for that task. Therefore, we are obligated to assess the overall situation in Michigan with respect to the opportunity of all voters to elect candidates of their choice. In making this assessment, the basic, underlying question that we must answer is how we gauge the extent to which Michigan, in formulating its reapportionment plan, has used race as a dominant force in drawing district lines. Unfortunately, we are at a distinct disadvantage in any analysis we make because the movement of any district line, or shifting of precinct boundaries, will have an effect that we cannot measure accurately. Analytical difficulties aside, the question of whether the State used race as a dominant line-drawing force is of paramount importance. As Justice Douglas observed thirty years ago:

> When racial ... lines are drawn by the State, the multiracial ... communities that our Constitution seeks to weld together as one become separatist; antagonisms that relate to race ... rather than to political issues are generated.... Since that system is at war with the democratic ideal, it should find no footing here.

*Wright v. Rockefeller*, 376 U.S. 52, 67, 84 S.Ct. 603, 611, 11 L.Ed.2d 512 (1964) (dissenting opinion).

■ The recently-decided cases of the United States Supreme Court in this area have adopted a middle ground, allowing some racial classifications as long as those classifi-cations do not unreasonably divide citizens into immutable categories or have an excessive economic impact on majority social groups. *See* Samuel Isacharoff, *Race and Redistricting*, 2 Reconstruction 118, 119–20 (1994) (reviewing cases); *Shaw v. Reno*, —— U.S. ——, —— – ——, 113 S.Ct. 2816, 2824–28, 125 L.Ed.2d 511 (1993) (plaintiff states an equal protection claim by alleging that the only possible rationale for reapportionment legislation is to separate voters on the basis of race); *cf. Regents of University of California v. Bakke*, 438 U.S. 265, 287–320, 98 S.Ct. 2733, 2746–64, 57 L.Ed.2d 750 (1978) (plurality opinion) (invalidating fixed, racially-based quotas in university admissions). Here, we are not faced with the unusual district configurations that the Supreme Court confronted in *Shaw*, and no party has raised the issue of whether the Michigan plan contains districts that, by shape alone, can be explained only by relying on racial classifications.

■ Political factors, of course, are also used to classify citizens under any reapportionment plan, and, although it would be otherwise in an ideal world, politics and racial identity currently are interrelated to at least some degree. This state of affairs, needless to say, only complicates our analysis further. We conclude that the plan adopted by the Michigan Supreme Court deserves deference from us to the extent that it was promulgated in accordance with factual determinations, based on factors in addition to race, that reflect political judgments regarding the dynamics of Michigan's electoral process. *Voinovich v. Quilter*, —— U.S. ——, ——, 113 S.Ct. 1149, 1157, 122 L.Ed.2d 500 (1993); *Cf. Johnson v. De Grandy*, —— U.S. ——, ——, 114 S.Ct. 2647, 2659–60, 129 L.Ed.2d 775 (1994) (a State does not violate the Voting Rights Act by using line-drawing standards that divide some ethnic populations, as long as the standards are neutrally chosen and consistently applied).[2] In this

2. Additionally, after the parties presented their closing arguments in this case, and while we were in the process of drafting this opinion, the United States Supreme Court decided *De Grandy*. In *De Grandy*, the Supreme Court clarified the analytical steps we are required to follow in assessing Michigan's reapportionment plan under the Voting Rights Act. The principles enunciated in *De Grandy* indicate that the evidence before us is more than sufficient to refute the plaintiffs' allegations. However, we wish to make clear that we have assessed Michigan's

regard, we note that the primary responsibility for assuring an equal opportunity to elect candidates of choice, no matter how that objective is achieved, rests with each individual state. *Id.* —— U.S. at ——, 113 S.Ct. at 1156 ("it is the domain of the States, and not the federal courts, to conduct apportionment in the first place"); *Growe v. Emison,* —— U.S. ——, ——, 113 S.Ct. 1075, 1081, 122 L.Ed.2d 388 (1993) ("reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court") (quoting *Chapman v. Meier,* 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975)).

## III. The Voting Rights Act as Applied to the Reapportionment Plan

### A. The Voting Rights Act

■ Section 2 of the Voting Rights Act, as amended in 1982, provides as follows:

2(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or [because the citizen is a member of a "language minority" group], as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, that nothing in this section establishes

a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973. Section 2(a) is a "results" test, and proof of discriminatory intent is thus unnecessary to establish a violation of this section. Section 2(b), in turn, provides guidance in applying the results test. *Chisom v. Roemer,* 501 U.S. 380, 394, 111 S.Ct. 2354, 2364, 115 L.Ed.2d 348 (1991). As a whole, Section 2 "prohibits any practice or procedure that, 'interact[ing] with social and historical conditions,' impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters." *Voinovich,* —— U.S. at ——, 113 S.Ct. at 1155 (quoting *Gingles,* 478 U.S. at 47, 106 S.Ct. at 2764–65). Within these limitations, a state may rely on traditional criteria, such as compactness and a reluctance to break county lines, in formulating a reapportionment plan. *Id.* —— U.S. at ——, 113 S.Ct. at 1156–57.

■ In *Gingles,* the Supreme Court, in a multi-member district context, addressed the 1982 amendments to the Voting Rights Act for the first time. In the course of its analysis, the Supreme Court established three "necessary preconditions" to a successful Section 2 claim:

First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.... Second, the minority group must be able to show that it is politically cohesive.... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766–67 (internal citations and footnotes omitted). The Supreme Court subsequently confirmed that these preconditions are also applicable to Section 2 challenges involving single-member districting schemes. *Voinovich,* —— U.S.

plan under the standards set forth in both *De Grandy* and *Gingles,* which together delineate our analytical approach. The Supreme Court's decision in *De Grandy* did not address constitu-

tional claims; instead, it dealt solely with alleged violations of the Voting Rights Act. *De Grandy,* —— U.S. at ——, 114 S.Ct. at 2650.

at ——–——, 113 S.Ct. at 1155–58; *Growe,* —— U.S. at ——–——, 113 S.Ct. at 1084–85. The plaintiffs bear the burden of proving that the *Gingles* preconditions exist in a particular case. *Voinovich,* —— U.S. at ——, 113 S.Ct. at 1156.

 Even if the plaintiffs prove the existence of the *Gingles* preconditions, the defendants may be able to defeat a Section 2 claim by showing that the minority group in question has achieved, or will achieve, substantially proportional representation under the challenged districting plan. *See De Grandy,* —— U.S. at ——, 114 S.Ct. at 2658–59 (substantial proportionality, in absence of discriminatory practices by State, is convincing proof of equal opportunity to elect candidates of choice).[3] As the Supreme Court stated in *De Grandy,* at —— n. 11, 114 S.Ct. at 2658 (internal citations omitted):

"Proportionality" as the term is used here links the number of majority-minority voting districts to minority members' share of the relevant population. The concept is distinct from the subject of the proportional representation clause of § 2, which provides that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." This proviso speaks to the success of minority candidates, as distinct from the political or electoral power of minority voters. And the proviso also confirms what is otherwise

clear from the text of the statute, namely that the ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race.

The "relevant population" to be used in determining proportionality depends, in each case, on the breadth of the allegations in the plaintiffs' complaint, and the geographic scope of the districts, if any, that are specifically challenged. *Id.* at ——, 114 S.Ct. at 2661. A finding of substantial proportionality, standing alone, has limited probative value; it must be examined under "the totality of the circumstances" to determine whether members of a minority group have been denied an equal opportunity "to participate in the political process and to elect representatives of their choice." *Id.* at ——–——, 114 S.Ct. at 2661; 42 U.S.C. § 1973(b).

 In *Gingles,* the Supreme Court identified a list of factors, originally set forth in the Senate Report explaining the 1982 amendments to the Voting Rights Act, that are relevant to an assessment of the totality of the circumstances. *Gingles,* 478 U.S. at 36–37, 106 S.Ct. at 2758–59; S.Rep. No. 417, 97th Cong., 2nd Sess., pt. 1, at 28–29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206–07. The extent of any history of official, discriminatory voting practices in the jurisdiction in question, and whether voting is racially polarized, are examples of these factors.[4] The

---

3. After several appearances by the parties before this Court, a hearing was held on the *Gingles* preconditions on November 30 and December 1, 1993. Evidence was produced that convinced the Court that a trial would be necessary on the general constitutional questions presented by the plaintiffs. This trial was held on April 18–20, 1994. Dr. Allan Lichtman, an expert witness who conducted a statistical analysis for the plaintiffs of African–American electoral success in Michigan, testified at trial on April 20 as follows:

[Counsel for defendants]: So the only time—as I understand it, the only time that the existence of a packed district is consistent with the fair plan as a whole is when you just can't create any more optimized districts, correct?

[Dr. Lichtman]: No, because I only gave you part of my assessment. The other part is, presuming you can create a number of minority districts, one might make the argument— and here we're getting perilously close to my opining on legal issues, but you're leading me to do that and I address that in my initial

report—whether there's a so-called "proportionality defense" that you've already created enough minority districts such that you have given minorities a reflection of their population in the jurisdiction.

In his initial report, Dr. Lichtman concluded that proportionality was not achieved under the 1982 reapportionment plan, and will not be achieved under the Michigan Supreme Court's 1992 plan, based on the statewide percentage of African–American districts and legislators as compared to the total African–American voting-age and general populations of Michigan. Lichtman Aff. #1 at 50–51. Dr. Lichtman thus appears to agree that some level of proportional representation, in general, can be a defense to a Section 2 claim.

4. The complete list is as follows:

(1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

list is not exclusive, and the plaintiffs need not prove any particular number of factors in a given case to establish a Section 2 violation. S.Rep. at 29.

## B. The Defense of Proportional Representation

For the purposes of our decision, we begin our analysis by addressing, with respect to both the House and the Senate, the State's defense of proportional representation. In assessing proportionality we use voting-age population figures, as the Supreme Court did in *De Grandy*. *De Grandy*, —— U.S. at ——,

> (2) the extent to which voting in the elections of the state or political subdivision is racially polarized;
> (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
> (4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
> (5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
> (6) whether political campaigns have been characterized by overt or subtle racial appeals;
> (7) the extent to which members of the minority group have been elected to public office in the jurisdiction.
> Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:
> [(8)] whether there is a significant lack of *responsiveness on the part of elected officials* to the particularized needs of the members of the minority group[;]
> [(9)] whether the policy underlying the state or political subdivision's use of [a] voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.
> S.Rep. at 28–29 (quoted in *Gingles*, 478 U.S. at 36–37, 106 S.Ct. at 2758–59).

5. In *De Grandy*, the Supreme Court rejected Florida's assertion that proportionality can be assessed properly only on statewide terms. Noting that "up until now the dilution claims have been litigated on a smaller geographical scale," the Court limited its proportionality analysis to a single county. *De Grandy*, at ——, 114 S.Ct. at 2662. The Court justified this limitation in geographical scope as follows:
> It is, indeed, the plaintiffs themselves ... who passed up the opportunity to frame their dilution claim in statewide terms. While the Unit-

114 S.Ct. at 2662–63. In addition, we limit the geographic scope of our assessment to Wayne and Oakland Counties, because the plaintiffs do not dispute the State's drawing of district lines except in those areas. *Id.* at ——, 114 S.Ct. at 2661–62.[5]

The Michigan House of Representatives consists of one hundred and ten delegates, all of whom are elected from single-member districts. Based on total population as determined by the 1980 Census, as well as the ideal district size, Wayne and Oakland counties combined were entitled to 41.27 House

ed States points to language in its complaint alleging that the redistricting plans dilute the votes of "Hispanic citizens and black citizens in the State of Florida," the complaint identifies "several areas of the State" where such violations of § 2 are said to occur, and then speaks in terms of Hispanics in the Dade County area (and blacks in the area of Escambia County). Nowhere do the allegations indicate that claims of dilution "in the State of Florida" are not to be considered in terms of the areas specifically mentioned. The complaint alleges no facts at all about the contours, demographics, or voting patterns of any districts outside the Dade county or Escambia County areas, and ... the evidence at trial ... [did not address] white bloc voting and political cohesion of minorities statewide. The De Grandy plaintiffs even voluntarily dismissed their claims of Hispanic vote dilution outside the Dade County area. Thus we have no occasion to decide which frame of reference should have been used if the parties had not apparently agreed in the District Court on the appropriate geographical scope for analyzing the alleged § 2 violation and devising its remedy. *De Grandy*, at ——, 114 S.Ct. at 2662 (internal citations omitted). The same circumstances cited by Supreme Court are present in our case. For example, the plaintiffs here have devoted their energies to assertions that the districts in Wayne and Oakland Counties were drawn in violation of Section 2. In addition, they voluntarily dismissed their vote dilution claim with respect to Kent County, and they did not attempt to analyze election patterns or cohesion among minority populations except in Wayne and Oakland Counties. The plaintiffs' complaint, in fact, states that their claim is based upon the vote dilution of "in particular, those African–American citizens residing in Wayne and Oakland counties." Accordingly, we assess whether proportionality has been achieved by looking at the voting-age population of Wayne and Oakland Counties.

districts.[6] The black voting-age population in Wayne and Oakland Counties, also as determined by the 1980 Census, represented 23.8% of the counties' total voting-age population. Simple arithmetic reveals that 23.8% of 41.27 House districts equals 9.8 districts. The 1982 Michigan reapportionment plan initially provided for twelve majority-black House districts, defined as having at least a 65% black voting-age majority, in Wayne and Oakland Counties.[7] Under this plan, from 1982 to 1990, these counties were represented by at least ten African–American House delegates at all times.

Based on total population as determined by the 1990 census, Wayne and Oakland Counties combined are entitled to thirty-eight House districts. The black voting-age population in these counties, according to the Census, represented 26.9% of the counties' total voting-age population. Aggregating these figures, 26.9% of thirty-eight House districts equals 10.2 districts. The Michigan Supreme Court's reapportionment plan, implemented in time for the 1992 elections, provided for eleven majority-black districts in Wayne and Oakland Counties,[8] as well as a twelfth, "influence" district (House District 2) containing a 57% black voting-age majority. As a result of the 1992 elections, eleven African–Americans currently represent Wayne and Oakland Counties in the Michigan House of Representatives.

The Michigan Senate consists of thirty-eight senators, all of whom are elected from single-member districts. Based on total population as determined by the 1980 Census, as well as the ideal district size, Wayne and Oakland Counties combined were entitled to thirteen Senate districts. African–Americans represent 23.8% of the counties' total voting-age population, and 23.8% of thirteen

Senate districts equals 3.1 districts. The 1982 Michigan reapportionment plan provided for three majority-black Senate districts in Wayne and Oakland Counties. Under this plan, from 1982 to 1990, these counties were represented at all times by three African–American Senators.

Based on total population as determined by the 1990 Census, Wayne and Oakland Counties contains 13.19 Senate districts.[9] The black voting-age population in these counties, according to the Census, represents 26.9% of the counties' total voting-age population, and 26.9% of 13.19 Senate districts equals 3.5 Senate districts. The Michigan Supreme Court's 1992 reapportionment plan provides for four majority-black districts in Wayne and Oakland Counties. At the present time, these counties continue to be represented by three African–American Senators, with the ability to elect a fourth, if desired, from an electorally effective majority-black district.

These figures demonstrate that African–Americans have achieved persistent, proportional legislative representation in Wayne and Oakland Counties as measured by voting-age population, and are likely to maintain that representation. This finding, however, does not end our inquiry. Although evidence of persistent, proportional representation strongly indicates that Section 2 has not been violated, "[i]n some situations, it may be possible for [Section] 2 plaintiffs to demonstrate that such sustained success does not accurately reflect the minority group's ability to elect its preferred representatives." *Gingles,* 478 U.S. at 77, 106 S.Ct. at 2780 (Brennan, J., joined by White, J.); *see also De Grandy,* —— U.S. at —— – ——, 114 S.Ct. at 2660–62 (evidence of racial gerrymandering, or of state practices designed to impede mi-

---

**6.** Numerical figures in this and subsequent sections are drawn from several reports prepared by the Michigan Information Center, Demographic Research and Statistics Unit, Department of Management and Budget, State of Michigan, and are compared with submissions made by both the plaintiffs and the defendants.

**7.** The number of majority-black districts in Wayne and Oakland Counties apparently grew slightly in the period from 1982 to 1990 due to population shifts, but the number of electorally

effective majority-black districts in these areas seems to have remained unchanged.

**8.** An additional majority-black district in Genesee County is not in dispute, and will not be considered in this proportionality analysis.

**9.** This figure includes, in Oakland County, 19% (.19) of another, largely extraneous Senate district. The remainder of this district is located in Genesee County.

nority registration and voting, may be sufficient to overcome a finding of proportional representation). As the Seventh Circuit recently noted in another reapportionment case, it seems clear that "[h]aving drawn [a certain number] of districts with secure black majorities, [a jurisdiction] could not prevent black citizens from voting in the election ... or otherwise discriminate against any class of citizens. A balanced bottom line does not foreclose proof of discrimination along the way." *Baird v. Indianapolis*, 976 F.2d 357, 359 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2334, 124 L.Ed.2d 246 (1993) (quoted in *De Grandy*, —— U.S. at ——, 114 S.Ct. at 2660–61). Intentional, official discrimination, of course, violates both Section 2 and the Constitution. *Id.*

■ We will address the question of intentional discrimination in Part IV, in dealing with the merits of the plaintiffs' constitutional claims. However, with respect to both the Senate and the House, the plaintiffs have not adduced any evidence that Michigan has directly attempted to prevent African–Americans from voting [10] during the time period in issue, or at any time in the recent past. Each of the plaintiffs' witnesses testified, in fact, that he or she was not aware of any official impediments to registration or voting in Michigan. We believe, therefore, that the defendants' showing of persistent, propor-

tional representation is sufficient to defeat the plaintiffs' Section 2 claims, absent proof of a racially discriminatory motivation in the drawing of the district lines.[11] Accordingly, we do not reach, nor need we reach in light of *De Grandy*, the question of whether the plaintiffs have established the *Gingles* preconditions, nor will we further discuss the Senate Report factors. *See De Grandy*, at —— – ——, 114 S.Ct. at 2655–59 (even assuming that *Gingles* preconditions were established, and that Hispanics suffered from the effects of historical, official discrimination, evidence of proportional representation was sufficient under the circumstances of the case to find that the Voting Rights Act had not been violated). We thus turn to plaintiffs' constitutional claims alleging intentional discrimination in the drawing of the district lines.

## IV. The Fourteenth and Fifteenth Amendments as Applied to the Reapportionment Plan

### A. The Constitution

The plaintiffs allege that the special masters and the Michigan Supreme Court intentionally discriminated against African–Americans in formulating the 1992 reapportionment plan, in violation of the Fourteenth and Fifteenth Amendments to the Constitution,

---

**10.** By "directly attempting to prevent African–Americans from voting," we are referring to mechanistic devices such as poll taxes, literacy requirements, multiple registration processes, and straightforward discrimination in the form of an outright prevention of voting. A more comprehensive list of these types of practices is set forth in *De Grandy*. *See De Grandy*, —— U.S. at ——, 114 S.Ct. at 2660–61. The Supreme Court's list also includes other practices "that are censurable when the object of their use is discriminatory," such as runoff requirements, anti-single-shot voting provisions, and impeachment of officials. *Id.* The plaintiffs make no allegations regarding this latter category of practices; accordingly, our search for a discriminatory purpose in Part IV is confined to an examination of the State's motivations for drawing district lines.

**11.** The plaintiffs dispute the manner in which the plan's jurisdictional breaks were minimized, and assert that the masters and the Court did not apply the State's reapportionment criteria consistently. In *De Grandy*, at ——, 114 S.Ct. at 2659, the Supreme Court stated that:

... where a State has split (or lumped) minority neighborhoods that would have been grouped into a single district (or spread among several) if the State had employed the same line-drawing standards in minority neighborhoods as it used elsewhere in the jurisdiction, the inconsistent treatment might be significant evidence of a § 2 violation, even in the face of proportionality.

Here, there is insufficient evidence to show that the masters or the Court applied different line-drawing standards to various ethnic populations. *See* discussion of jurisdictional breaks *infra*, at n. 21–22. Moreover, as the Supreme Court observed, "some dividing by district lines and combining within them is virtually inevitable and befalls any population group of substantial size. Attaching the labels "packing" and "fragmenting" to these phenomena, without more, does not make the result vote dilution when the minority group enjoys substantial proportionality." *De Grandy*, at ——, 114 S.Ct. at 2659.

by: (1) failing to create a fifth, majority-black Senate district in Wayne County; and (2) failing to create at least 14 majority-black House districts, either completely within Wayne County or by crossing Eight Mile Road, a multi-lane divided highway that historically has separated Wayne and Oakland Counties. The essence of the plaintiffs' arguments, with respect to both claims, is that the masters and the Michigan Supreme Court refused to consider creating additional majority-black districts because they desired to minimize the number of such districts and keep certain white communities from being submerged in them.

■■■■ As a preliminary matter, we note that it is unclear whether the Fifteenth Amendment applies to vote dilution claims, and, if so, to what extent. *See Shaw,* —— U.S. at —— – ——, 113 S.Ct. at 2822–24 (discussing Fifteenth Amendment at length with respect to racial gerrymandering, but ultimately deciding case on Fourteenth Amendment grounds); *Voinovich,* —— U.S. at ——, 113 S.Ct. at 1158 ("This Court has not decided whether the Fifteenth Amendment applies to vote-dilution claims; in fact, we never have held any legislative apportionment inconsistent with the Fifteenth Amendment.") (citation omitted). Insofar as the present action is concerned, we believe that the Fifteenth Amendment's prohibition against "purposeful discriminatory denial or abridgement by government of the freedom to vote 'on account of race, color, or previous condition of servitude' " is subsumed in the analysis required under the Fourteenth Amendment's equal protection clause. *Mobile v. Bolden,* 446 U.S. 55, 65, 100 S.Ct. 1490, 1499, 64 L.Ed.2d 47 (1980) (quoting the Fifteenth Amendment); *see also Turner v. Arkansas,* 784 F.Supp. 553, 578–79 (E.D.Ark. 1991) (three-judge court) (proof of conscious racial discrimination required in both Fourteenth and Fifteenth Amendment cases), *aff'd mem.,* —— U.S. ——, 112 S.Ct. 2296, 119 L.Ed.2d 220 (1992). To make out a claim under the Fourteenth Amendment, the plaintiffs must show: (1) intentional discrimination; and (2) a resultant discriminatory effect. *Davis v. Bandemer,* 478 U.S. 109, 127, 106 S.Ct. 2797, 2807–08, 92 L.Ed.2d 85 (1986).

■■■ In determining whether or not the State intentionally discriminated against the plaintiffs on the basis of race, in violation of the equal protection clause of the Fourteenth Amendment, we must evaluate the "totality of the relevant facts." *Washington v. Davis,* 426 U.S. 229, 242–43, 96 S.Ct. 2040, 2048–49, 48 L.Ed.2d 597 (1976). This evaluation may include consideration of the following elements: (1) the impact of the official action on members of different racial groups; (2) the foreseeable effects of the action; (3) the historical background of the decision to act, including legislative or administrative history; (4) the specific sequence of events leading to the action; and (5) substantive and procedural departures from the decision-making routine. *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266–68, 97 S.Ct. 555, 563–65, 50 L.Ed.2d 450 (1977).

■■■ Here, a discriminatory purpose on the part of the State, if found, need only be a motivating factor in its decision to draw the district lines as it did; it need not be the sole or even primary factor in that decision in order to find a violation of the Fourteenth Amendment. *Id.* at 265, 97 S.Ct. at 563. A discriminatory purpose, as a motivating factor, "implies more than intent as volition or intent as awareness of consequences." *Personnel Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). Rather, it implies that the decision-maker "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* With these standards in mind, we turn to a factual analysis of the plaintiffs' claims.

## B. The Senate

Under the Michigan Supreme Court's reapportionment plan, Wayne County contains four majority-black Senate districts. These four districts are: District 2, with a 67.6% black voting-age majority; District 3, with a 70.7% majority; District 4, with an 84.5% majority; and District 5, with a 65.4% majority. District 3 also has a 7.7% non-black Hispanic population in addition to its 70.7%

black majority. A fifth district, District 1, has a 49.2% black voting-age population and contains the largely white communities of Harper Woods and the Grosse Pointes. These districts could have been drawn to make District 1 a fifth majority-black district, with the concomitant effect of partially deconcentrating District 4.

The plaintiffs maintain that in creating only four majority-black Senate districts in Wayne County, the special masters and the Michigan Supreme Court were at least partially motivated by a desire to keep the white communities of Harper Woods and the Grosse Pointes from being placed in a fifth, majority-black district, and a desire to minimize the total number of electorally effective majority-black districts. In support of this contention, the plaintiffs refer to each of the elements listed by the United States Supreme Court in *Arlington Heights* as relevant to a consideration of the totality of the relevant facts in an intentional discrimination claim. *Arlington Heights*, 429 U.S. at 266–68, 97 S.Ct. at 563–65. With respect to the first element, the impact of the official action, the plaintiffs contend that the reapportionment plan minimizes the opportunity of African–Americans to elect candidates of their choice, and ensures that white communities will not be submerged in majority-black districts. Plaintiffs further argue, under the second element, that this result was foreseeable because the Michigan Supreme Court and the masters obviously were aware of the racial composition of the districts in their plan, and because numerous alternative plans were proposed by various parties that provided for a fifth majority-black Senate district in Wayne County.

With respect to the historical background against which we consider the reapportionment plan, the plaintiffs stress that in Michigan, as in other states, there has been a long and tragic history of official discrimination against African–Americans. Although laws prohibiting many forms of official discrimination were passed in Michigan during the latter half of the nineteenth century, African–Americans continued thereafter to suffer from *de facto* segregation in the public school system, impediments to registration and voting, and housing discrimination, the last of which was not formally prohibited in Michigan until 1976. The parties in this action have stipulated that substantial socioeconomic disparities exist between African–Americans and whites to this day, due largely to these practices. Emphasizing the continuing housing discrimination that has resulted in racial residential segregation, the plaintiffs characterize the current legislative reapportionment plan, against this historical backdrop, as only the "latest chapter" in a Michigan tradition of official and private racial discrimination.

Turning to the fourth *Arlington Heights* element, the specific sequence of events leading up to the Supreme Court's promulgation of the apportionment plan, the plaintiffs argue that the underlying proceedings in this case, including the various reports and opinions issued, demonstrate that the masters and the Michigan Supreme Court refused even to consider drafting a plan that would provide for five majority-black Senate districts. According to the plaintiffs, the masters' report failed to explain why such a plan, which both parties, Democratic and Republican, involved in that litigation agreed provided a "fair share" of political power to African–Americans, was not adopted. The plaintiffs make several arguments to support the inference that the masters and the Michigan Supreme Court actually intended to minimize the number of majority-black districts, and minimize the number of whites in those districts. They begin with the argument that the four majority-black Senate districts, and particularly District 4, are "concentrated," and that these districts were also deliberately undersized in order to both minimize the number of whites that are included in them and to make it possible to create a fifth, undersized majority-white district. The plaintiffs interpret what they claim is the "key sentence" in the masters' report—"VRA interests were recognized and followed, but not to the exclusion of concerns of integrity of existing boundary lines, communities of interest, compactness, and contiguity"—as code language for the masters' actual intent to establish only so many majority-black districts as would be necessary to avoid a

charge of retrogression, and to minimize the number of whites in those districts.

In this regard, the plaintiffs assert that all of the plans submitted by various parties to the masters and the Michigan Supreme Court established five reasonably compact, contiguous, electorally effective majority-black Senate districts within Wayne County. Thus, they maintain, there were no compactness, contiguity, or boundary concerns preventing the formation of a fifth majority-black district. The plaintiffs conclude that the masters' and the Michigan Supreme Court's failure to create such a district, where clearly permitted to do so by the federal Voting Rights Act, can only be explained by a racially discriminatory motivation. In support of this argument, the plaintiffs note that the Michigan Supreme Court adjusted five of the masters' proposed House districts to provide an "even better racial balance," creating an additional, electorally effective majority-black district where there had previously been only a majority-black district, but did not similarly adjust the proposed Senate districts. The plaintiffs argue that the only reason that the Court did not

adjust the Senate districts in the same manner as the House districts is that such an adjustment would have required transforming a majority-white Senate district into a majority-black district, in contrast to the House district modification. The Court's failure to modify the Senate districts in keeping with its apparent criteria for the House, the plaintiffs assert, is evidence under the fifth and final *Arlington Heights* element that the Court had a racially discriminatory motive in departing, both in substance and procedure, from its decisionmaking routine.

■ There is strong evidence, however, that the masters and the Michigan Supreme Court did not have a racially discriminatory motive in configuring the present Senate districts. Expert witness Eric Swanson, Director of the Michigan Information Center, Demographic Research and Statistics Unit, observed that transforming Senate District 1 into an electorally effective majority-black district would have had the following consequences: (1) lowering the black population of a redrawn District 2,[12] at best, to a level of marginal electoral effectiveness;[13] (2) split-

---

**12.** All of the proposed plans that provide for a majority-black District 1 require an enlargement of that district's southwestern corner, thereby incorporating portions of eastern Detroit, and a reduction in size of the district's northwestern corner. Because District 2, in all plans, runs along the northwestern border of District 1, redrawing District 1 in this manner creates a "ripple effect" in District 2, which then has to be compensated for in redrawing Districts 3 through 5. District 4, the district with the highest African–American population in the Court's plan, is geographically separated from District 1 by District 2. Thus, due to population and contiguity constraints, as well as basic compactness concerns, a nearly all-white 15% of District 1's population must be transferred to District 2 in exchange for an equal number of African–Americans in order to make District 1 a marginal electorally effective majority-black district. Because of this population transfer, and the aforementioned considerations, Districts 3 through 5 cannot be redrawn in a manner that completely compensates for District 2's percentage loss of African–Americans while still retaining electorally effective black majorities. *See infra,* at n. 13.

**13.** In both of the NAACP's initial proposed plans, which create five majority-black Senate districts, District 2 has only a 62.4% African–American majority based on voting age population figures. *See* Plaintiffs' Exhibits 2 and 3. This percentage is slightly below what the plaintiffs previously

have maintained, in the House of Representatives context, to be the minimum voting-age population percentage (65%) generally necessary to ensure that African–Americans have the opportunity to elect a representative of their choice. We note that, even by crossing into Oakland County in one of their initial plans, the plaintiffs were unable to provide for a higher percentage of African–Americans in District 2. The plaintiffs subsequently submitted a third, somewhat revised Senate plan in which they did manage to raise the percentage of African–Americans in District 2 slightly, to 63.5%. In this plan, however, the proposed District 1 only has a 63% majority-black population. *See* Plaintiffs' Exhibit 18. These percentages fall short of the 65% standard usually advocated by the plaintiffs when the state government is responsible for creating the apportionment plans. None of the four majority-black districts in the State plan have black voting-age populations of less than 65%, and only one, District 4, has a black population of more than 71%.

We are aware that, when using voting-age population for measurement purposes, 60% may be more appropriate than 65% as a rough benchmark for assessing the electoral effectiveness of majority-black districts. *See Ketchum,* 740 F.2d at 1415 (65% used in total population context, and 60% in voting-age population context; 5% upwards adjustment is meant to compensate for the relative youthfulness of minority popula-

ting the substantial, concentrated, non-black Hispanic population in southwestern Detroit, currently located in District 3, between at least two newly-drawn districts;[14] and (3) significantly decreasing the overall compactness of Wayne County Senate districts, as measured by Michigan's scoring method.[15] The effect on the District 2 black population of creating a majority-black District 1 is clearly evident in the proposed plans submitted to the masters. Also, the masters and the Michigan Supreme Court specifically stated that "fracturing" of the Hispanic population was a concern in formulating the apportionment plan. *See* Report of the Special Masters, p. 9; *In re Apportionment–1992*, 439 Mich. at 737 n. 51, 486 N.W.2d at 652. These factors are persuasive in explaining why the Michigan Supreme Court adjusted the House districts in the masters' plan, but not the Senate districts.

The last consequence, decreased compactness, is a valid consideration if the State is minimizing it in a consistent, racially impartial manner. *See, e.g., Karcher v. Daggett,* 462 U.S. 725, 740, 103 S.Ct. 2653, 2663, 77 L.Ed.2d 133 (1983) (appropriate legislative policies in Congressional redistricting, if consistently applied, include compactness, respecting municipal boundaries, and preserving cores of prior districts). In this regard, we note that the method of measuring compactness used by the State was adopted in 1982, and the plaintiffs have adduced no evidence tending to show that this method was chosen "because it would accomplish the collateral goal" of perpetuating racial segregation during reapportionment. *Feeney,* 442 U.S. at 279, 99 S.Ct. at 2296.

In addition to these considerations, the defendants emphasize that the total population in each of the Court's Wayne County

tions). However, there is "no bright line rule for discerning an appropriate VAP [voting age population] level within a district that passes Voting Rights Act muster." *Puerto Rican Legal Defense and Educ. Fund v. Gantt,* 796 F.Supp. 681, 694 (E.D.N.Y.1992). Regardless of which figure we employ, the general effect on District 2 of making District 1 a majority-black district is the same. We also reiterate that the plaintiffs in this case have consistently advocated a 65% figure in criticizing the Michigan plan, and, accordingly, we have assessed their proposed plans using that same figure. We emphasize that this assessment was conducted solely in order to elucidate the extent to which reapportionment criteria are interdependent; our purpose was not to decide whether a particular proposed plan was "better" than that promulgated by the Michigan Supreme Court. The focus of our inquiry, instead, is on the adequacy of the Court's plan.

14. For example, all three of the NAACP's proposed plans split the Hispanic population in this manner. In the NAACP's plans, Hispanics represented a maximum of between 5.2% and 5.9% of the total population in districts encompassing parts of southwestern Detroit. In the State's plan, Hispanics represent 7.7% of the total population in District 3.

15. *See* definition of compactness *supra,* at n. 1, criterion number 12. Under Michigan's "circular area" scoring method, decimal fractions approaching one signify greater compactness and lower fractions, approaching zero, denote lesser compactness. Using Michigan's method, the statewide compactness score for NAACP Senate proposal # 1 is .41, while the score for the Court plan is .43. The disparity is due to the difference

in Wayne County district configurations between the plans. Testimony at trial established that under Michigan's method of measurement, the Court's District 1 is somewhat more compact than the alternative District 1 proposals.

The NAACP has submitted one Senate plan that provides for five majority-black Senate districts in Wayne County and also has the same number of jurisdictional breaks as the State plan. *See* Court Exhibit A(1) and Plaintiffs' Exhibit 18. However, these five majority-black Senate districts, both individually and in the aggregate, are less compact than the five Senate districts covering the same geographical area in the Court's plan. The overall compactness scores for Senate Districts 1–5 are: NAACP plan—.32, Court plan—.41. *See* Court Exhibit A(1). The compactness scores for the individual districts in these plans are: District 1—NAACP plan .39, Court plan .62; District 2—NAACP plan .22, Court plan .27; District 3—NAACP plan .26, Court plan .31; District 4—NAACP plan .21, Court plan .30; and District 5—NAACP plan .51, Court plan .54. *See* Court Exhibits B(15) and (16). The shape, and, to a limited extent, the compactness score of District 1 are partially predetermined because Lake St. Clair and the Detroit River border the district to the east and south, respectively, while the Wayne–Oakland County line borders the district to the north. The influence of these factors, in a relative manner, can be seen in the opposing plans: District 1 is the second most compact district in the NAACP plan, and is the most compact district in the Court plan. The quantitative difference in compactness scores is due to the variance, between the NAACP and Court plans, in the drawing of District 1's western boundary.

Senate districts is well below the ideal population for those districts.[16] If the Michigan Supreme Court had intended to reduce black political strength in the legislature, they contend, it would have required that majority-black districts be of at least ideal size. If all such districts were drawn at this ideal size, it appears that Wayne County, where most of the State's African–American population is located, would lose at least one electorally effective, majority-black Senate district. *See* Defendants' Exhibit 33.[17] Plaintiffs respond, however, that the drawing of undersized districts, especially in conjunction with the concentration of black population in District 4, was also intended to minimize the number of white persons included in majority-black districts.

The difficulty of deconcentrating District 4 is demonstrated in the NAACP's proposed plans. In all of these plans, with "optimization" of the African–American vote a prime consideration, District 4 contains the highest black population of any district, with levels ranging from 66.9% to 77.9% of the district's total population. *Compare* Plaintiffs' Exhibits 2, 3, and 18 *with* Plaintiffs' Supplemental Exhibits 23 and 24, discussed *supra*, at n. 14. The black population of District 4 in the Court's plan is 85.2% of the district total. Moreover, just as in the Court's plan, all of the majority-black districts in the NAACP plans that accord some deference to state reapportionment criteria contain well below the ideal population.[18]

These facts undercut the plaintiffs' argument that the Michigan Supreme Court's formation of undersized majority-minority districts, in conjunction with a concentrated District 4, is evidence of a desire to keep whites from being submerged in those districts. The alleged deficiencies in the Court's plan are also present, to significantly the same degree, in the NAACP plans, with a substantive difference only in the number of majority-black districts created. Thus, we cannot logically assume that these deficiencies are calculated, as a general matter, to produce a racially discriminatory result. It appears, instead, that the masters and the Court applied their previously-approved method of apportioning Wayne County merely "in spite of," rather than "because of" its adverse effects on African–Americans, in order to take into account the valid considerations described above. *Feeney*, 442 U.S. at 279, 99 S.Ct. at 2296. Also, the net effect of applying the State's reapportionment criteria, after racial concerns were addressed, was to ensure proportional Senate representation for African–Americans without regard to District 1, and to provide a 55% black majority in District 1 that has a real opportunity to elect a candidate of its choice.

## C. The House of Representatives

With respect to the House plan, the plaintiffs maintain that it was possible to create at least fourteen electorally effective majority-black House districts by crossing Eight Mile

16. The five Wayne County Senate districts in the Court plan had a mean deviation of 6.64% below the ideal population size of 244,613. The maximum allowable population deviation under the Apol state reapportionment criteria is +\− 8.2%, a standard accepted by both parties.

17. After inquiries from the Court at trial, the plaintiffs submitted two plans to the Court that provide for five majority-black Senate districts with nearly ideal populations. These plans necessarily subordinate other reapportionment criteria to this population objective. In order to achieve this result in the first of the two plans, the plaintiffs were forced to draw two majority-black districts that cross the Wayne–Oakland County line. *See* Plaintiffs' Exhibit 23. Also, of the five majority-black districts in the first plan, only District 4, with 74%, has at least a 63% black voting-age population. In the second plan,

the plaintiffs only drew one district, which is majority-white, that crosses the Wayne–Oakland County line. *See* Plaintiffs' Exhibit 24. Of the five majority-black districts in the second plan, again, only District 4, with 66.9%, has at least a 65% black voting-age population. *See* discussion of majority-black district electoral effectiveness *supra*, at n. 13.

18. Ironically, in the NAACP's third and final pretrial plan, the mean population deviation below the ideal of proposed Wayne County Senate districts 1–5, covering roughly the same area as in the Court's plan, is 6.64%—identical to that in the Court's plan. *See* Plaintiffs' Exhibits 1 and 18; Defendants' Swanson Affidavit, Attachment 9. In the NAACP's other two pretrial plans, the mean deviations below the ideal population are 3.95% and 2.82%. *See* Plaintiffs' Exhibits 2 and 3; *see also* discussion of post-trial plans *supra*, at n. 17.

Road, and that the creation of these districts clearly was permissible under the federal Voting Rights Act. They also observe that Eight Mile Road is a racial dividing line between the heavily black population of Wayne County and the majority-white population of Oakland County,[19] and allege that the two counties form a single "economic and mobility unit." Under these circumstances, the plaintiffs contend, the masters' and the Michigan Supreme Court's failure to create additional majority-black districts by crossing Eight Mile Road can be explained only by a desire to minimize African–American electoral representation and prevent the submergence of Oakland County whites in those districts. The plaintiffs place particular emphasis on what they describe as the masters' and the Michigan Supreme Court's absolute refusal to consider drafting a plan that provides for at least fourteen majority-black House Districts. In the plaintiffs' view, the Court applied its reapportionment criteria inconsistently, because it did not explain adequately the reasons why it altered five House districts to provide for an "even better racial balance," but did not create additional majority-black districts where it was clearly possi-

ble to do so. These assertions are very similar to those the plaintiffs make in regard to the Senate apportionment plan. The plaintiffs again assert, for instance, that the majority-black districts in the current plan are deliberately undersized in order to prevent white communities from being included in them. The defendants, in turn, reiterate that the majority-black districts in the NAACP pretrial plans are all similarly undersized,[20] weighing against the conclusion that undersized districts are necessarily a sign of racially discriminatory intent. In response to the plaintiffs' further contention that the Court's plan was drawn with the intention of minimizing the number of majority-black districts to a non-retrogression level, the defendants demonstrate that if all majority-black House districts in Wayne County were drawn at ideal size, the county would lose one such district. See Defendants' Exhibit 33 at p. 4. Finally, the defendants point out that the Court's plan is somewhat more compact and contains fewer jurisdictional breaks than the plaintiffs' plans,[21] and that these criteria, as previously explained, were neutrally applied.[22]

19. The record does not establish when Eight Mile Road became the "racial dividing line," as distinguished from the "dividing line." Eight Mile Road, originally known as Base Line Road, follows the course of a line laid out in the original government survey of Michigan. This line was designated at that time as the horizontal benchmark for surveyed townships.

20. The mean deviations below the total population ideal of 84,502, for Wayne and Oakland County majority-black districts in a representative sample of plans, are: (1) NAACP House proposal # 1 (Plaintiffs' Exhibit 5)—3.32%; (2) NAACP proposal # 2 (Plaintiffs' Exhibit 17)—3.35%; (3) "Neff Primary Plan" (Plaintiffs' Exhibit 11)—6.88%; and (4) Court plan (Plaintiffs' Exhibit 4)—3.49%. See discussion of additional, post-trial plans supra, at n. 17.

21. The statewide compactness scores for various representative House plans, including that of the Supreme Court, are: (1) NAACP proposals 1, 2, and 3 (multiple versions)—.41; (2) NEFF Primary and Overlay proposals—.38; and (3) Supreme Court plan—.47. In any set of plans, the plan with the highest score is the most compact. See supra, at n. 15. Thus, the Supreme Court House plan is more compact than the other proposed plans. The jurisdictional break scores for the various plans are: (1) NAACP proposals—41

county breaks, 41–44 city/township breaks, and 82–85 total breaks; (2) NEFF Primary proposal—42 county breaks, 41 city-township breaks, and 83 total breaks; (3) NEFF Overlay proposal—38 county breaks, 38 city/township breaks, and 76 total breaks; and (4) Supreme Court plan—38 county breaks, 35 city/township breaks, and 73 total breaks. The Supreme Court's House plan, once again, contains fewer jurisdictional breaks than do the other proposed plans. Finally, a direct comparison of the potentially majority-black House districts, Districts 2–14 and 35–36, in the NAACP's proposal 2 and the Supreme Court's plan is instructive. Looking solely at these districts, we see that the NAACP plan has a compactness score of .35 and 17 jurisdictional breaks, while the Supreme Court plan has a compactness score of .41 and only 2 jurisdictional breaks. See Court Exhibit A(1).

22. See discussion supra, at pages 474–75. With respect to the assertion that Wayne and Oakland Counties form a single "economic and mobility unit," the plaintiffs rely almost exclusively on the fact that there is a large amount of commuter traffic "for educational, cultural, entertainment, and other purposes" between the counties. See Report of Kurt Metzger at 2–4; Plaintiffs' Exhibit 15, n. 2. In our view, this evidence, standing alone, is insufficient to support a necessary finding that an elected official can effectively repre-

578

## V. Conclusion

In essence, with respect to both the House and Senate, the plaintiffs assert that it was possible for the State of Michigan to create additional, electorally effective black-majority districts without seriously altering its normal apportionment criteria, and that the failure to create those districts is both proof of intentional, unconstitutional racial discrimination and a violation of the federal Voting Rights Act. The State, however, did not violate either the Act or the Constitution "simply because [the Supreme Court did] not enact a districting plan that maximizes black political power or influence." *Turner*, 784 F.Supp. at 573. Stated concisely, the State is not obliged under the Act to provide for as many majority-minority districts as possible. *De Grandy*, ⸺ U.S. at ⸺, 114 S.Ct. at 2659-60. In addition, the sole fact that the Court did not draw that maximum number of districts is insufficient to prove intentional, unconstitutional discrimination. *See Feeney*, 442 U.S. at 279-281, 99 S.Ct. at 2296-97 (discriminatory purpose may not be inferred solely from effect of state action on a particular group). Thus, the plaintiffs' claims must fail unless they provide proof that the Court applied Michigan's reapportionment criteria unevenly, or chose those criteria to further a discriminatory purpose. After carefully considering the record before us, we conclude that the plaintiffs have failed to carry their burden of proof on either issue for the reasons stated above. Accordingly, we find that the Michigan Supreme Court's reapportionment plan satisfies the requirements of the federal Voting Rights Act and the Constitution.

Race is not, and must not be allowed to become, the sole defining characteristic by which we judge individual citizens or reapportionment plans. There are a multitude of other factors that have a profound influence on who we are, as well as how we vote. In evaluating whether a particular group has been afforded a fair opportunity to elect representatives of its choice, justice requires a consideration of these other, complex factors in addition to racial concerns. Once these concerns have been addressed, as the Michigan Supreme Court noted, reapportionment ultimately involves practical questions of politics and the application of traditional line-drawing criteria. These criteria deserve deference if they are applied in a neutral and balanced manner, and are not chosen to further a racially discriminatory purpose.

Here, the Michigan Supreme Court properly considered all of the above factors in formulating its reapportionment plan, while concentrating appropriately on ensuring fair representation for African–Americans. We conclude that the Court's plan violates neither the federal Voting Rights Act nor the United States Constitution, because there is simply insufficient evidence to support the plaintiffs' claims of vote dilution and intentional racial discrimination.

For the foregoing reasons, it is ordered that the Clerk shall enter a judgment for the defendants.

### *JUDGMENT*

This matter came to trial before the court. Pursuant to the court's decision and order dated July 14, 1994,

---

sent constituents in both counties simultaneously. *See Clark v. Calhoun County, Mississippi*, 21 F.3d 92, 96 (5th Cir.1994) (proposed district that draws population from multiple municipalities must "retain a natural sense of community such that it can be effectively represented").

The plaintiffs also contend that the masters' and the Michigan Supreme Court's failure to cross Eight Mile Road in order to create additional majority-black House districts cannot be understood in light of the fact that, in the Court's Senate plan, there is a break between Oakland and Genesee Counties. In the plaintiffs' view, the toleration of a county break in the latter instance, but not in the former, is evidence that the State's apportionment criterion of minimiz-

ing jurisdictional breaks was not neutrally and evenly applied. The Oakland–Genesee break, however, is located in a rural area and is in no way comparable to a break created by crossing Eight Mile Road. In this regard, we note that the jurisdictional breaks in both the House and Senate plans of the Michigan Supreme Court occur almost exclusively in rural areas, where population divergence concerns are less easily resolved by tinkering with the sizes of multiple districts within acceptable limits. *See, e.g.,* Report of the Special Masters, pp. 4–6, 11. These data weigh against the conclusion that the Court's failure to cross the Wayne–Oakland line in promulgating its House plan, as justified in part by the State's reapportionment criteria, was due to a racially discriminatory motive.

IT IS ORDERED AND ADJUDGED that judgment be, and hereby is, entered for defendant and against plaintiffs.